(Nos. 44341, 46045 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CALVIN LEROY MADISON, Appellant.

*Opinion filed March 20, 1974.*

Paul Bradley, District Defender, of Chicago (Kenneth L. Jones, Assistant District Defender, and Harry C. Z. Bell, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Philip G. Reinhard, State's Attorney, of Rockford (James B. Zagel and Raymond McKoski, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Defendant, Calvin Madison, and Thomas Charles were indicted for the murder and armed robbery of John Hogan, who worked as a gas station attendant in Rockford, Illinois. Following a separate jury trial in the circuit court of Winnebago County, defendant Madison was convicted of both offenses and upon the jury's recommendation the death penalty was imposed. While defendant's direct appeal was pending in this court (43 Ill.2d R. 603), he filed a petition seeking post-conviction relief (Ill. Rev. Stat. 1971, ch. 38, par. 122—1 *et seq.*). After an evidentiary hearing at which counsel was appointed to advise defendant, the petition was denied and defendant appealed. Issues pertaining to the admissibility of defendant's confession and possible adverse pretrial publicity are common to both appeals, which have been consolidated for decision and opinion.

The evidence adduced at trial may be summarized as follows: On January 22, 1970, about 8:20 P.M., a customer drove into a gasoline station owned by the victim's father. The station was located on the northwest corner of Miriam and State in Rockford. When no one appeared to service the vehicle, the customer entered to find the victim in a sitting position on the washroom floor. His head was bloody. The customer informed the victim's father, who lived adjacent to the station, and the police were notified. The victim was hospitalized but died the

next morning at 10:00 A.M. from two .22-caliber bullets which had entered the top of his head and penetrated the brain in a downward trajectory. One other bullet had grazed his skull, and there were entrance and exit wounds in the victim's neck where he had also been shot. Approximately $190 was missing from the station register.

Prior to the arrival of the customer, three young women had parked their automobile north of the station and were walking south on Miriam toward State. They walked in the street because of the freshly fallen snow. As they approached the corner of State and Miriam, they heard two noises which sounded like gunshots. Two men were then seen running from the station in a southeasterly direction to the other side of the street. Both men were dressed in dark clothing and large hats described by one woman as resembling those worn by "flamenco dancers." The women proceeded to their friend's house located a short distance from the station and at 8:15 P.M. the police were called.

Officer Philip Thompson arrived at the gas station about 8:30 P.M. Pursuant to the directions of Sergeant Gessner, Thompson and several other officers began to search the area for footprints. Thompson walked south on Howard until he arrived at an intersecting alley about one-half block from the station. He proceeded eastward and midway in the alley perceived one set of footprints and other marks which indicated that a person had fallen. He traced the origin of the footmarks to the south curb of State, which was the area where the three women had last seen the two men running from the gas station. Gessner and two other officers were summoned and the four began to follow the prints. The footsteps had sufficient distance between each impression to suggest that the person who made them had been running. From the alley the prints were followed southward between two houses and across Elm Street (one block south of State). There the police tracked the impressions about one-half block eastward to

the southeast corner of Elm and Webster where another set of footprints coming from a northerly direction joined the prints they were tracing. The two sets of footprints took a southerly direction on Webster for one block. Thompson saw no other prints in the freshly fallen snow at this point. His observation was corroborated by Gessner, who further said that it had stopped snowing shortly before his arrival at the gas station.

At the corner of Webster and Chestnut the trail of prints went west for one-half block to an alley. These prints also seemed far apart. From this point the footprints were followed south for two blocks through the alley to Berkley where they were traced a short distance to a driveway of the home owned by defendant's mother. Here, tire marks were also found, suggesting that a car had recently been driven away. Gessner looked about the immediate vicinity and saw no other footprints in the area except for several leading from the street to the driveway. He then talked to defendant's mother.

Both Thompson and Gessner had also discerned two sets of footprints heading northward in the alley between Berkley and Chestnut. Gessner said those prints appeared similar to the ones they were following southward and seemed to take a westerly direction after reaching Chestnut. Their origin was traced to the driveway.

Gessner explained that one set of footprints he followed that evening was distinctive because deep heel-mark impressions in the snow were visible, indicating that part of the heel was cut out. The other set of footprints was less peculiar but seemed to have an arc where the shoes did not touch the snow.

Shortly before midnight Officer Sebastian Aiello and three other policemen arrived at 214 Loomis and proceeded to the second-floor apartment of Michael Hill. Defendant answered the door and told the police that he had been waiting for them. Defendant was placed in a squad car after being handcuffed. Aiello's partner informed defend-

ant of his *Miranda* rights (*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) and defendant said that he understood. He was transported to the station where his shoes were taken, a primer residue test was administered and he was placed in a cell.

During this time police had secured a written consent from Hill to search his apartment. There police discovered an expended .22-caliber cartridge in Hill's bedroom. The consent of the occupant of the apartment below was obtained and that apartment was also searched. At this time Marilyn Hobbs, the occupant's daughter, gave police a vase containing a canvas bag, money and a box of .22 shells. A search of the couch revealed a .22 "long" cartridge with its tip cut off. The weapon used in the crime was never discovered, although police searched a parking lot behind this building.

About 3:00 A.M. on January 23, 1970, Officers William Francis and Kenneth Ladwig returned to the police station from the hospital where the victim had been taken. They were "briefed" about the progress of the case. At 4:45 A.M. they went to defendant's cell, awakened him, informed him of the complaint for attempted murder and armed robbery and then took him to the detective bureau. There he was advised of his *Miranda* rights and he asked what they wanted to talk about. The subsequent conversation lasted about one hour, during which time defendant received coffee and cigarettes.

Defendant initially denied knowledge of the robbery. He then admitted that he was at the gas station but said that he did not shoot the victim. He claimed that he and Charles had walked to the station with the intent to commit a robbery. During this time Charles had given defendant a gun. When they arrived at the station, Charles went into the washroom and defendant confronted the victim, took the money and ordered the victim into the washroom. Defendant refused to say anything further.

Finally, at 6:30 A.M., defendant said that he would

give a statement if he could call his father. A telephone was provided and the call made. During the conversation defendant said that he was "in big trouble" because he shot a man during a robbery. At the conclusion of the telephone conversation, defendant told the police that he would give a statement but, on the advice of his father, would not sign it without consulting a public defender.

Defendant was given a written waiver form detailing the *Miranda* rights, which he read. Officer Francis then read the entire form to defendant before he signed it. The waiver form properly set forth the *Miranda* warnings, including the admonition that anything that defendant would "say could be used against [him] in court." A paragraph entitled "WAIVER OF RIGHTS" immediately preceded defendant's signature. It stated, in part, "I am willing to make a statement and answer questions. I do not want a lawyer at this time." The notation "0630" was at the top of the page and "0635" appeared under Officer Ladwig's attesting signature. These entries denoted the time.

Office Francis placed a statement form in a typewriter and again read the *Miranda* rights contained in the introductory paragraph. Defendant would speak and Francis would type and then read what he had transcribed. The process took about 20 minutes to complete. In the statement defendant admitted shooting the victim, being driven to the Loomis address by Michael Hill and giving the money and bullets to Marilyn Hobbs. He claimed he threw the .22-caliber weapon into the parking lot behind Hobb's apartment. Defendant read the statement, said it was true but refused to sign it. The notation "0635" appears on the statement. Further questioning continued at about 7:00 A.M. and defendant said that the prior evening their car would not start and Hill went to get assistance. Testimony of personnel from a nearby gas station established that Hill came to the station seeking aid for a disabled automobile. Their testimony provided an

alibi for Hill between 7:50 and approximately 8:30 P.M. on the night of the murder.

Defendant was taken to his brother's house to obtain shoes and, while talking to him in the presence of the police, defendant said he shot a man. He was driven to the parking area where other officers were conducting an unsuccessful search for the weapon. The lot had been plowed and the police were digging in the mounds of snow.

Laboratory examination of shells found in the gas station indicated that they were fired from the same weapon. An expended cartridge found on the station floor was described as a .22 "long" with the tip cut off allowing it to be adapted to a weapon capable of firing only .22 "short" ammunition. Several bullets discovered in the apartments at Loomis matched the composition of the bullets used in the crime, and the manufacturer of the sawed-off bullet taken from the couch was the same as that of the shell discovered in the station. Comparison of impressions made by the shoes taken from defendant and Charles indicated that they were similar in size and shape to photographs of the footprints which the police followed to the driveway of the home of defendant's mother. The primer residue test administered to defendant was positive, indicating he had handled a recently fired gun or ammunition. This test was given to Charles and Hill and it produced the same result.

Pursuant to a warrant police searched the house of defendant's mother on January 23, 1970. In the basement two black "Morgan-type" hats were discovered. A clothing store owner testified that he had sold many hats of this style. He said that they were very popular.

Gordon Madison, defendant's brother, testified that two policemen brought defendant to his house at 7:30 A.M. the day after the murder. This witness said that his brother never admitted participating in the crime and that defendant told him that he asked the police for the

assistance of a lawyer but his request was denied. He said he was informed of defendant's arrest by a telephone call from his father about 7:00 A.M.

Arthur Madison, defendant's father, said he received a call at 2:00 A.M. on January 23, 1970. He was told by defendant that a man had been shot but he said that his son denied involvement in the matter and asked for a lawyer. No mention was made of receiving a telephone call from defendant at 6:30 A.M., and this witness disclaimed calling his son, Gordon, at 7:00 A.M.

Defendant briefly testified in his own behalf and confirmed calling his father at 2:00 A.M. He had not mentioned this specific conversation during the pretrial hearing on his motion to suppress any statements he made, nor had his father or brother testified at that proceeding. He denied any involvement in the crime. On cross-examination he admitted pleading guilty to armed robbery in 1965. An authenticated copy of the record of this conviction was introduced.

Defendant contends in both his direct and post-conviction appeals that the statements he allegedly made to Officers Ladwig and Francis should have been suppressed. He concedes that the substance of the admonishments complied with *Miranda*. Only Officer Francis testified at all proceedings at which the statement he gave after calling his father was challenged (pretrial, trial and post-conviction). Officer Francis's testimony did not substantially vary. During the hearing on the motion to suppress, defendant admitted that when he was taken into custody by Officer Aiello he was given the *Miranda* warnings and said that he understood. Further examination of defendant produced the following colloquy:

"Q. How many different occasions did the police officers read you the card [containing the *Miranda* warnings]?

A. How many different occasions?

Q. Yes.

A. I think it was five.

Q. Five different times?
A. Four or five.
Q. And on each occasion did you understand what they were reading you?
A. Yes, I did."

Defendant argues that he did not waive his rights when Officers Ladwig and Francis first began to question him at 4:45 A.M. on January 23. He relies on Officer Francis's testimony that after defendant was advised of his rights no express waiver was obtained. It would appear that defendant infers that testimony concerning his admission of participation in the crime elicited prior to his telephone call to his father was improper. We do not agree. Defendant was fully aware of his rights as heretofore established. The mere fact that no express waiver was obtained when Officers Ladwig and Francis began their questioning is of no consequence under these circumstances. See *People v. Johnson,* 55 Ill.2d 62, 71; *People v. Pittman,* 55 Ill.2d 39, 52, and cases therein cited.

It is argued that his statement given after he talked to his father is also improper because he informed the police that while he would give a statement he would not sign it until a public defender was present. Defendant interprets this as establishing his intent not to give a statement that could be used against him, that he did not understand that an oral admission was of evidentiary value and that he wanted to consult an attorney. These arguments are without merit. The record overwhelmingly presents a knowing and voluntary relinquishment of constitutional guarantees and the admission of defendant's inculpatory statements was proper.

Defendant also implies that the statement which he refused to sign was produced prior to his interrogation and was a fabrication. To support this position he directs our attention to the fact that the waiver form designated the time which he signed it as "0635" and this same notation appears on the unsigned statement. At the hearing on the motion to suppress, defense counsel inquired about these

entries and Officer Francis explained that this notation may have indicated that the statement had started at 6:35 A.M. after defendant signed the waiver. We do not believe that acceptance of this explanation at the pretrial hearing was contrary to the manifest weight of the evidence (see *People v. Prim,* 53 Ill.2d 62, 70, *cert. denied,* 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731), and the post-conviction record fails to establish a basis for defendant's contention.

Defendant asserts that he was denied a fair trial by adverse pretrial publicity. His motion seeking a change of venue was denied. Various newspaper articles were submitted in support of this motion. At the post-conviction hearing a transcript of a radio editorial broadcast on February 4, 1970, was also introduced. All but two articles were disseminated before mid-February, 1970. The two remaining news items were published on April 25 and May 15, 1970. Both these articles concerned the defense motion for a change of venue. Defendant's trial commenced on July 6, 1970. The only specific objection that defendant raises to the substance of these news articles concerns references made in several of them describing the crime as an "execution" killing. The radio editorial did not identify the defendant but said those accused of the crime might receive a lengthy term of imprisonment. This broadcast also noted other crimes which had occurred in the area and then congratulated the police for their efforts.

In *Irvin v. Dowd,* 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, the United States Supreme Court said that "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal

cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence present in court."

In this case the members of the petit jury expressed their belief that they were impartial and would render a verdict based solely on the evidence. During the *voir dire* examination several jurors said that they did not even recall reports of the crime and others had only vague recollections of the incident. (See *People v. Torres,* 54 Ill.2d 384, 388.) Moreover, we are cognizant of the fact that the publicity took place several months prior to trial (*People v. Bixler,* 49 Ill.2d 328, 333, *cert. denied,* 405 U.S. 1066, 31 L. Ed. 2d 796, 92 S. Ct. 1500) and that defense counsel did not utilize many of his peremptory challenges to dismiss prospective jurors. This latter factor is significant in determining whether the jurors were impartial. (*People v. Steel,* 52 Ill.2d 442, 452, and cases therein cited.) Having considered the content of the various news items which have been submitted, the time that they were disseminated, and the *voir dire* examination that was conducted, we are of the opinion that the jury's decision was not influenced by pretrial publicity.

Defendant further endeavors to establish bias, contending that a jury which is qualified to recommend the death penalty is more likely to convict. In support of this position he has submitted a survey compiled by Professor Hans Zeisel. This contention has been repeatedly rejected and further comment is unnecessary. *People v. Pittman,* 55 Ill.2d 39, 57.

Defendant asserts that prejudicial and inflammatory evidence was introduced when, over objection, the prosecution elicited from him the fact that he pleaded guilty to armed robbery 5½ years prior to this trial. As previously

set forth, an authenticated copy of this conviction was subsequently introduced.

Defendant's argument would seem to be twofold. Citing *People v. Montgomery,* 47 Ill.2d 510, he maintains that the prior conviction must be relevant to the defendant's veracity before proof may be introduced to establish the conviction. *Montgomery* cannot be decisive, for that opinion was rendered after defendant's trial and *Montgomery* has been given only prospective application. (*People v. Sanders,* 56 Ill.2d 241, 249; *People ex rel. Walker v. Pate,* 53 Ill.2d 485, 500.) In *Sanders* defendant was convicted of the murder and armed robbery of a police officer. There we held that evidence of defendant's five prior armed-robbery convictions was proper for impeachment under pre-*Montgomery* standards.

Defendant, however, maintains that reversible error occurred when he was forced to initially acknowledge this conviction during cross-examination. In *People v. McCrimmon,* 37 Ill.2d 40, 45, *cert. denied,* 389 U.S. 863, 19 L. Ed. 2d 131, 88 S. Ct. 120, we said, "a procedure which permits the impeaching material to be presented against the defendant twice and in two forms, *viz.,* by cross-examination and by the record, is not approved. Impeachment of the defendant should be by means of the record of conviction or an authenticated copy." This rule is founded upon the possibility that a defendant might be prejudiced during a jury trial if he is forced to testify concerning prior convictions. (*People v. Bey,* 42 Ill.2d 139, 147.) We reaffirm our decision in *McCrimmon* and further hold that language which might be construed to the contrary in *People v. Neukom,* 16 Ill.2d 340, 348, is to be given no effect.

While the presentation of the prior conviction by means of cross-examination was improper, reversal is not required unless the error has deprived defendant of substantial justice or influenced the determination of his guilt. (*People v. Morehead,* 45 Ill.2d 326, 332, *cert.*

*denied,* 400 U.S. 945, 27 L. Ed. 2d 251, 91 S. Ct. 251.) In the present case defendant's confession as well as substantial circumstantial evidence clearly established his guilt. The question propounded on cross-examination pertaining to his prior conviction was not reversible error.

Defendant's final allegation of error was raised for the first time during the post-conviction proceedings. He avers that the police lacked a sufficient factual basis to arrest him, thereby rendering any subsequent statements he made inadmissible as a product of an illegal arrest. Two bases are advanced for defendant's position. He implies that because four officers were originally involved in tracking the footprints, the trail was not sufficiently clear. This inference is not supported by the testimony of Officer Thompson at the evidentiary hearing and is directly refuted by his testimony and that of Sergeant Gessner during the trial. The necessity of four police officers is evident from the fact that they believed they were following those who committed an armed robbery and gravely wounded the victim.

Defendant further argues that Officer Thompson's testimony at the evidentiary hearing negated the footprints as a factor in establishing probable cause to arrest him. It was adduced that when Thompson returned to Webster to photograph the footmarks, he observed a second set made by a person walking in the opposite or northbound direction. These prints were not followed. Thompson said he did not see these marks as he was initially tracing the other prints south on Webster. Sergeant Gessner's trial testimony corroborates this. At the evidentiary hearing no inquiry was directed to the time at which Thompson returned to Webster and discovered the additional prints upon which defendant relies. Examination of the trial transcript discloses that he arrived at 1:30 A.M., five hours after he had originally traced the prints to the home of defendant's mother. Aerial photographs establish that the area is residential in nature. It is not inconceivable that

during the five-hour interval one of the many police officers investigating the case or an area resident had walked northward on Webster.

The principle is well settled that the defendant bears the burden of establishing a substantial violation of his constitutional rights in post-conviction proceedings. (*People v. Bracey,* 51 Ill.2d 514, 517; *People v. Thomas,* 51 Ill.2d 39, 41; *People v. Southwood,* 49 Ill.2d 228, 229.) He has not done so here.

There exists no error requiring reversal of defendant's conviction. The sentence imposed, however, is improper. (*Moore v. Illinois,* 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.) Accordingly, we affirm the judgment of conviction but vacate the sentence imposed thereon and remand the cause to the circuit court of Winnebago County with directions to sentence defendant to a penalty other than death.

*Affirmed and remanded, with directions.*