THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* UDEL BELTRAN, Defendant-Appellant.

Second District   No. 76-262

Opinion filed August 17, 1977.

Ralph Ruebner, of State Appellate Defender's Office, of Elgin, for appellant.

Gerry L. Dondanville, State's Attorney, of Geneva (Phyllis J. Perko and Martin P. Moltz, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

After a jury trial, the defendant was convicted of burglary and theft of property valued at less than $150, and sentenced to 1 to 3 years in the penitentiary. He appeals, contending that the prosecutor improperly cross-examined him regarding a prior felony conviction, and that a reversal of the trial court's judgment and sentence is therefore mandated.

Immediately prior to trial, the defendant moved *in limine* for an order prohibiting the State from introducing certified copies of the defendant's prior convictions. This motion was granted in part, the trial court holding that the State would be limited to introducing only one of the defendant's four prior robbery convictions, in the event that the defendant took the

stand. However, although the prosecutor then had a certified copy of one of the convictions marked for identification, through apparent inadvertence, it was never offered into evidence at trial.

Instead, the defendant's prior conviction was presented to the jury during the prosecutor's cross-examination of the defendant, as follows:

"Q. Okay. Have you ever been convicted of a felony?

A. Yes, sir.

Q. What have you been convicted of?

MR. MORELLI [defense counsel]: Your Honor, I'm going to object to going into the circumstances of the previous conviction.

THE COURT: He admitted he's been convicted. That's sufficient. Objection sustained."

■■ The State, implicitly conceding that the question was improper, contends that any error was waived by defense counsel's failure to make an immediate objection after the question was asked, prior to the defendant's answer. However, in view of our holding in *People v. Cassman* (1973), 10 Ill. App. 3d 301, this contention must be rejected. In *Cassman*, we held that it is improper to cross-examine a defendant as to his prior conviction of a crime, and that the error is of such magnitude that it constitutes plain error which may be considered by a court of review even where no objection to the offending question has been made at trial.

■■ Nonetheless, it does not follow that a reversal of the defendant's conviction is mandated in this case. "Where the competent evidence shows, beyond all reasonable doubt, that the defendant is guilty in a case where the jury are not the judge of the penalty to be inflicted upon the defendant, error will not ordinarily require reversal of the judgment of conviction." (*People v. Tranowski* (1960), 20 Ill. 2d 11, 17, *cert. denied*, 364 U.S. 923.) It has been stated that it is not the policy of courts of review in Illinois to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury resulted from the error. (*E.g., People v. Dudley* (1974), 58 Ill. 2d 57, 61.) Thus, where the evidence against the defendant is such that the jury could scarcely have arrived at any other verdict, a conviction will be affirmed, notwithstanding the fact that the defendant was subjected to improper cross-examination regarding a prior conviction. (*People v. Madison* (1974), 56 Ill. 2d 476, 488-89.) A review of the evidence adduced at trial is therefore necessary to the disposition of this appeal.

The complaining witness, David Michaels, testified that on May 12, 1975, he arrived at a tavern called the Romania Club, parked his car in the parking lot, leaving his keys in the ignition, and went inside. Michaels

observed six patrons in the tavern, one of whom was the defendant, Beltran. In order to gain entrance to the tavern, it is necessary for a patron to operate a "buzzer" at the door; whenever Michaels was in the tavern and the buzzer sounded, he would look up and observe the person who was entering. While in the tavern on this occasion, he observed an individual enter, purchase a six-pack of beer, and immediately leave. The only other person to leave the tavern while Michaels was there was the defendant, who left by himself and then returned and went into the men's room. Michaels remained in the tavern for what was apparently another 15 minutes to one-half hour, and then went outside, where he discovered that his car was gone. He returned to the tavern, and the police were called. On direct examination, Michaels testified that while he was waiting for the police to arrive, the defendant emerged from the men's room, holding Michaels' car keys in his hands, and asked Michaels "if these were what [he] was looking for." Michaels replied that they certainly were, since they were his car keys. On cross-examination, Michaels evidently became confused on this point, since he seemed to indicate that the defendant gave Michaels the keys before Michaels went outside. However, on redirect, Michaels reiterated that defendant had given him the keys after Michaels had returned to the tavern in order to call the police. In any event, the defendant told Michaels that he had found the keys in the urinal in the men's room; however, Michaels observed that the keys were not wet. The defendant then asked Michaels if Michaels wanted him "to stay around in case the police asked any question."

After two police officers arrived, Michaels rode with them, looking for his car. They found it one block from the Romania Club. When Michaels and the officers returned to the tavern, they observed the defendant standing by his car with the hood up, working on the engine. Michaels returned to his car and discovered that two spare tires, a set of golf clubs, a pair of golf shoes, a motorcycle rack and a bumper jack were missing from the trunk, although the trunk opened normally after Michaels inserted the key, and there was no sign of a forced entry. Michaels then returned to the tavern parking lot, where he and the two officers observed a spare tire in the back seat of the defendant's car. Michaels identified the tire as the one which had been taken from his trunk, and the officers then checked the trunk of the defendant's car where they found the balance of the items which had been taken from Michaels' car trunk.

Both of the officers also testified at trial. One of the officers testified that the defendant told him that the golf clubs, shoes, spare tires and other items belonged to the defendant. The other officer stated that when he asked the defendant how the items in the defendant's car came to be

found there, the defendant replied that he didn't know. The defendant also told the officers that he was working on his car because it wouldn't start.

The only witness presented by the defense, was the defendant himself. He testified that a man came up to him in the Romania Club on the evening in question, and offered to sell him some tires. The defendant said that he had never seen the man before, that the man was an inch taller than the defendant, with "not too long hair" which was "more curley" than the defendant's. He stated that the man was "not skinny" but when asked for clarification, the defendant replied that the man "was skinny." The defendant said that he and the man went outside together, and walked to the man's car. The man opened the trunk and showed the defendant the tires, telling the defendant that he wanted $15 for them. The defendant gave the man $15, and the man then offered to sell the golf clubs, shoes and other items to the defendant for an additional $10. The defendant gave the man the amount he requested, took the items he had purchased, put them in his car, and went back into the tavern. He stated that he subsequently found Michaels' keys in the urinal in the tavern, gave them to Michaels, and told Michaels that he intended to remain at the tavern drinking in case Michaels needed him. He had a number of drinks, and then went out to his car, which wouldn't start. He was working on his car when the police approached him. He testified that he had told the officers that he didn't know anything about the items in his car, because he was afraid, since he didn't have a driver's license.

Under cross-examination, the defendant stated that he couldn't remember what kind of car the man who sold him the items in question had had, or whether the man's car was "big" or "small," or whether it was a light or a dark colored car.

■■ On this record, the jury could not have entertained a reasonable doubt of the defendant's guilt, regardless of whether or not there was any mention or evidence of his prior convictions. It is undisputed that Michaels' car was burglarized while he was inside the Romania Club drinking, that the car was subsequently found a mere block from the tavern, and that the defendant left and returned after 15 minutes or more, during the period of time that Michaels was inside. Since there were no signs of a forced entry, it is apparent that the offender used the keys which Michaels left in the ignition to open the trunk, and there was no question but that the defendant had had those keys in his possession, and that the items which were taken from Michaels' car trunk were found shortly thereafter in the defendant's car. Michaels' testimony established that the defendant was the only person to leave the tavern while Michaels was there, prior to the time that Michaels discovered that his car was missing, who had also been in the men's room where the car keys were

purportedly found. It is true that this testimony was in conflict with the defendant's statement that he left the tavern in the company of the unidentified stranger who sold him Michaels' property, but the defendant's version of the event was rendered wholly implausible by the combination of his vague description of the unknown "seller," his complete inability to recall even such basic details about the seller's car, as whether it was "big" or "small," "light" or "dark," and his subsequent statement that he didn't know how the stolen items came to be in his car. Similarly, the defendant's claim that he found Michaels' car keys in the urinal of the tavern restroom was rendered questionable by Michaels' uncontradicted testimony that the keys were dry when the defendant gave them to him. By contrast, though there was a degree of confusion in Michaels' testimony as to the exact time, and, in one instance, sequence of the events in question, his testimony was clear and convincing on every point relevant to the prosecution's case. The defendant's apparent willingness, as expressed to Michaels, to stay at the tavern and cooperate in any investigation was belied, to a degree, by his subsequent attempt to start his car, and readily explained by the fact that the inoperative condition of his car, which was filled with bulky, stolen items and parked in front of the tavern, left him with no other options.

■■ Since the jury could not have reasonably found that the defendant was not guilty, even absent any testimony or evidence of the defendant's prior convictions, the trial court's error in permitting the defendant to be cross-examined regarding a prior conviction was harmless beyond a reasonable doubt.

The judgment of the circuit court of Kane County is therefore affirmed.

Judgment affirmed.

SEIDENFELD and GUILD, JJ., concur.