THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THERMON HOWARD SMITH, Defendant-Appellant.

Fifth District   No. 5—89—0322

Opinion filed December 31, 1992.—Rehearing denied March 17, 1993.

Thermon Smith, of Joliet, appellant *pro se.*

Keith Jensen, Special Prosecutor, of Granite City (Kenneth R. Boyle, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Thermon Howard Smith, was found guilty of the murders of Alvin Autery and Mary Irwin and also on two counts of home invasion. The jury subsequently found defendant eligible for the death penalty, but the State's Attorney later withdrew his request for its imposition. Accordingly, defendant was sentenced to concurrent terms of natural life in the Department of Corrections without the possibility of parole on the murder convictions and concurrent 30-year prison terms for the two counts of home invasion. In this cause, defendant raises a number of issues: (1) whether defendant was proven guilty of murder and home invasion beyond a reasonable doubt; (2) whether the trial court committed reversible error in allowing hearsay evidence presented by James Bizaillon which indicated that defendant set up a drug deal on the day of the murders; (3) whether the trial court erred in requiring defendant to try on a glove found at the murder scene; (4) whether it was reversible error for the prosecutor to cross-examine defendant concerning his prior convictions rather than to impeach defendant by introducing certified copies of defendant's previous convictions; and (5) whether defendant's convictions and sentences for home invasion are lesser-included offenses of the murders for which defendant was convicted. In addition to these five issues raised in the brief filed by the appellate defender, defendant has filed his own *pro se* brief in which he addresses additional alleged errors not raised by the appellate defender. Specifically, defendant contends that the trial court committed plain error when it permitted the prosecutor to ask questions of the jurors on *voir dire* which informed them that defendant was in the penitentiary system at the time the instant charges were brought. Defendant further contends that the trial court abused its discretion when it allowed the State to introduce into evidence a large butcher knife as the alleged murder weapon. Finally, defendant contends he was denied effective assistance of counsel.

The parties are in general agreement as to the following facts. On February 5, 1987, defendant was indicted for four counts of murder, two counts of felony murder in violation of section 9—1(a)(3) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)), and two counts of murder in violation of section 9—1(a)(1) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) involving two victims, Alvin Autery, a 39-year-old retarded male, and Mary Irwin, a 41-year-old retarded female. The two victims lived together at 620 Olmstead in Alton. Defendant was also charged with two counts of home invasion under section 12—11(a)(2) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2)).

At the time defendant was charged, and at the time of trial, he was serving time in the Centralia Correctional Center on an unrelated felony. The case went to trial on September 20, 1988. The State presented evidence that the victims were murdered in their home. The victims were found by caseworkers for the Retarded Association on July 1, 1986. Both victims had multiple stab and blunt-trauma wounds and had bled to death. Their bodies had already begun to decompose and had maggots on them. A bent kitchen knife, a broken fan, and a damaged radio/cassette player, with hair and blood on it, all of which could have caused some of the victims' blunt-trauma injury, were found at the scene. A video cassette recorder (VCR) was found by the back door of the victims' home, and a glove with blood on it was found in shrubbery at the rear of the victims' home. The only fingerprint found at the scene belonged to Alvin Autery. A butcher knife with blood on it was found in a vacant lot approximately four blocks or more from the victims' residence on July 23, 1986. Tests performed on the blood found on the glove and knife were inconclusive. The crime lab was unable to determine the type of blood on those articles or even if it was human blood.

The State presented three witnesses who provided testimony connecting defendant to the murders in question because of statements made by defendant to them or overheard by them. Michael Carter, who knew defendant for approximately 20 years, testified that he was at an all-day/all-night barbecue at his aunt's home at 1319 Garden Street in Alton sometime near the end of June. At approximately 5 a.m., he saw defendant walking down the street toward him. According to Michael, defendant had blood on his shirt, on the back of his ear, and on both of his thighs. Defendant told Michael that he had killed some people. Michael testified that his uncle, Charles Carter, was standing nearby when he talked to defendant. Michael went with defendant to defendant's mother's home, where defendant planned to

borrow his mother's car. Michael told defendant to wash the blood off himself and his clothes. At defendant's mother's house, defendant gave details of how he killed the victims. He told Michael he stabbed one with a knife and killed one with a fan. Defendant did not tell Michael who else was with him at the time of the murders.

Defendant told Michael that he could get a VCR and asked Michael if he knew anyone who would want to buy it. Apparently, around this time, Michael was "fencing" stolen property. Michael testified that he did not want to get involved in a murder and, therefore, refused to assist defendant. Michael did not initially tell the police about what he observed or heard because he was afraid for himself and his family. Later, Michael told his parents about the incident, and his parents convinced him to go to the police. On December 15, 1986, Michael gave a statement to the police concerning defendant's involvement in the instant offenses. Michael testified he also talked to the police about the murders in the summer of 1986.

At the time of trial, Michael was attending Southern Illinois University at Carbondale and was enrolled in its mortuary program. He planned to become a mortician and go to work for a family member who owned a mortuary in Tennessee. Michael had two prior felony convictions for retail theft. He also admitted that he was a recovering drug addict and an alcoholic. Michael admitted that in June 1986, he was drinking heavily.

Charles Carter, a union painter at the Alton Lock and Dam, testified that he was attending a barbecue when defendant stopped by to talk to his nephew, Michael. Charles did not know defendant but Michael told him who he was. Charles testified that Michael pointed defendant out to him on the day of trial. According to Charles, when defendant arrived at the barbecue, he was sweaty and looked like he had been running and in a fight. Defendant had blood on his chest and arm. Charles overheard parts of the conversation between defendant and Michael. He specifically heard defendant say that he had "offed a couple of people." Charles also heard defendant say he hit someone with a lamp or ashtray. Charles made a statement to the police in the summer of 1986. He made a written statement on December 12, 1986. In his statement, Charles said that he did not know defendant, did not want to know defendant, and did not remember what defendant said.

Ronald Jackson testified about conversations he had with defendant while both were incarcerated at the Centralia Correctional Center during which time defendant made certain admissions about the murders. Jackson had prior felony convictions for forgery, deceptive prac-

tice and theft. At the time of his conversations with defendant, Jackson was serving a two-year prison sentence. Jackson has a bachelor's degree from Southern Illinois University. During his incarceration at the Centralia Correctional Center, Jackson was known as a "jailhouse lawyer" and assisted inmates with legal problems. Jackson first spoke with defendant in either January or February 1987. Defendant initially asked in the hypothetical whether a person could stop the State's Attorney and the Department of Corrections from asking other inmates about whether that person had told them about his involvement in a crime. Jackson told defendant that he did not think there was anything that could be done. Defendant then explained to Jackson that he and a friend named Ernest Perry, who was in the Madison County jail, had been involved in a murder. Defendant stated that the police did not have any evidence against them but later stated that he had heard that Ernest had been talking to the police about the murders. Defendant told Jackson that he had his cousin tell Ernest to keep his mouth shut.

According to Jackson, defendant discussed the details of the murders with him. Defendant told Jackson that he and Ernest Perry had gone into a retarded family's home in order to steal some things so that they could sell them and then use the proceeds to buy drugs. A drug deal had been set up by Ernest's sister, Lucille Perry, who had since died of cancer. While in the victims' house, defendant and Ernest were discovered by the victims. The victims were hit in the head and stabbed with a knife. Afterward, defendant threw away his shirt because there was blood on it. Defendant said it could not be recovered. Defendant also told Jackson he had disposed of the murder weapon. Defendant was concerned whether Lucille Perry's testimony could be used now that she was dead.

Jackson testified that all the other inmates he had assisted had already been tried and were serving their sentences. Jackson had no qualms about assisting someone who felt he was unjustly imprisoned. However, in the instant situation, Jackson felt morally obligated to write the police about defendant's admissions because defendant had not been charged with the murders and the victims were handicapped. Jackson wrote a letter to the Alton police outlining what defendant told him. After the Alton police received Jackson's letter, they arranged to meet with him in Metropolis, where Jackson gave them additional details about the murders based upon his conversations with defendant. About a week after his meeting with the Alton police, Jackson was confronted by defendant and two "Metro" gang members. Jackson was concerned about his safety and called the Alton po-

lice. Jackson was taken out of the penitentiary the next day and finished serving his sentence at the Madison County jail. Jackson was released on June 26, 1987. He did not receive a reduced sentence or any other consideration for the information he provided the Alton police or for his testimony at trial against defendant. Jackson admitted that his letters to the Alton police did not provide much detail about the killings, but he explained that this was because he feared his letters might be intercepted by someone in the penitentiary. Jackson stated that he gave full details to the police during his interviews.

Additional witnesses for the State included Lindell Pyatt, an Alton police officer, who testified that as standard practice the Alton police do not make public some information, such as the way in which victims were killed. In the instant case, the Alton police did not disclose that the victims were hit with a fan or a radio. Officer Pyatt could not be certain whether such information was released after Ernest Perry was charged on January 10, 1987.

Defendant testified on his own behalf that he did not know the victims and did not kill them. According to defendant, he knew Karen McGuire, also known as Karen Robinson, who lived at 621 Olmstead, directly across the street from the victims. Defendant testified that he only saw Ms. McGuire three to four times during all of 1986. Defendant stated that on the weekend of the murders, he was home the entire weekend, from Friday, June 27, through Sunday, June 29, because he was sick with the flu. Defendant testified that he knew Michael Carter but was not a friend. Defendant denied seeing Carter on June 28 or 29, 1986. Defendant also denied telling Michael Carter that he killed some people.

Defendant admitted that he talked with Ronald Jackson in February 1987. Defendant was concerned because the authorities were asking other inmates about defendant's involvement in the murders and were offering a reduction in their sentences or a $10,000 reward for information concerning defendant's involvement in the instant crimes. Defendant was concerned some inmates might lie to the police about defendant's involvement in order to receive the reward or a reduction in their sentence. Defendant denied committing the murders and denied ever making such admissions to Jackson. Defendant testified that he told Jackson he had been charged with the murders because Michael Carter, who was a drug addict, told the police he had seen defendant with blood on his shirt. Defendant knew what Michael Carter had told the police because the police showed defendant a videotape of Michael Carter's statements. Defendant surmised that Jackson could have learned of the details of the murders from television

newscasts aired after Ernest Perry and defendant himself were charged with the crimes. Ernest Perry was charged on January 10, 1987, and defendant was charged on January 29, 1987.

Defendant testified he occasionally went to the Perry residence during the summer of 1986, even though he and Lucille Perry were no longer dating. On July 1, 1986, defendant saw police vehicles in the area of the murders and read about the murders in the newspaper and saw television news reports. Defendant denied that he told the police that he first learned about the murders from Karen McGuire, also known as Karen Robinson, or her son, Christopher.

During cross-examination, defendant was asked if he had ever previously tried to hide his fingerprints. Defendant denied ever doing so. The prosecutor then asked if defendant had been convicted in four previous cases, namely, Nos. 79—CF—362, 81—CF—239, 83—CF—7, and 87—CF—735. Defendant acknowledged these convictions. The prosecutor asked if, during questioning in one of these previous cases, defendant told the Alton police he wore socks over his hands to conceal his fingerprints. Defendant stated he jokingly told the police this after they found a pair of socks in his pockets. Later, on re-cross, the prosecutor asked defendant to try on the glove which was found at the victim's home in some shrubbery behind the residence. Over defendant's objection, defendant was ordered to try on the glove in front of the jury. During the State's closing argument, the prosecutor commented on how the glove fit defendant's hand.

Defendant's mother, Annie Smith, testified defendant had the flu on the weekend of June 27 through 29, 1986. As far as she knew, defendant did not leave the house the entire weekend. Two of defendant's sisters, Shirley Beard and Ada Smith, corroborated defendant's alibi that he was sick the entire weekend of June 27 through 29, 1986, and as far as they knew, defendant had not left the house.

Karen McGuire, also known as Karen Robinson, testified as a rebuttal witness for the State. Karen Robinson's mother and defendant's mother were best friends prior to her mother's death. Robinson lives at 621 Olmstead, directly across from the victims' house. She testified defendant stopped by to see her approximately two to three times per week during the summer of 1986. She also testified that she did not tell defendant about the victims' murders and that during the summer of 1986 she did not have a telephone.

Officer Ventimiglia of the Alton police department testified on rebuttal. He stated that defendant told him he heard about the murders when his mother received a telephone call from either Karen Robinson or her son, Christopher. Officer Pyatt also testified on rebuttal.

According to Pyatt, defendant told him that he stayed home the entire weekend of June 27 through 29, 1986, because he had no money. Pyatt stated that the police never offered a $10,000 reward or a reduction in sentence to inmates interviewed at the Centralia Correctional Center regarding the instant murders.

James Bizaillon testified in rebuttal for the State. Mr. Bizaillon owns an auto body shop and used car lot located across the street from the Perry residence. According to Bizaillon, Ernest Perry and defendant came to his shop to use his telephone on Saturday, June 28, 1986. Bizaillon did not overhear the conversation, but one of his employees did. The employee relayed to Bizaillon what was being discussed, and as a result, Bizaillon kicked Perry and defendant out of his shop. Bizaillon testified that the reason defendant and Perry were asked to leave was that he did not let anyone make drug deals on his telephone. In surrebuttal, defendant denied ever being in Bizaillon's place of business or ever being kicked out of it.

The jury ultimately found defendant guilty on all counts and found defendant eligible for the death penalty. The State's Attorney thereafter decided not to seek the death penalty. Defendant was later sentenced as previously discussed. Motions for a new trial were filed and later denied. The appellate defender was appointed to represent defendant on appeal. In addition, defendant filed a *pro se* brief on his own behalf.

## I

The first issue we are asked to address is whether defendant was proven guilty of murder and home invasion beyond a reasonable doubt. Defendant argues that he was not because the only evidence to connect him to the crime was the impeached testimony of three witnesses who claim that defendant admitted to them that he committed the murders. Defendant points out that Michael Carter had a history of dishonesty, that he waited nearly six months to come forward, and that at the time he did come forward, he had pending charges against him. Additionally, Charles Carter waited several months before going to the police and, at times, stated that he did not overhear the conversation between defendant and his nephew, Michael. Finally, Ronald Jackson was a convicted felon serving time, which, according to defendant, makes his testimony totally incredible and beyond belief. The State replies that the testimony of Michael Carter, Charles Carter, and Ronald Jackson, to whom defendant made admissions of guilt, along with the inconsistencies between defendant's own testi-

mony and that of the defense witnesses, establishes defendant's guilt beyond a reasonable doubt. We agree.

The resolution of defendant's guilt or innocence depends on the credibility of the witnesses and the weight given to their testimony. In general, the determination of issues is left to the trier of fact, in this case the jury. (*People v. Ellis* (1978), 74 Ill. 2d 489, 496, 384 N.E.2d 331, 334.) Only if we find the evidence to be so improbable or unsatisfactory as to raise a serious doubt as to defendant's guilt should we reverse the conviction. (*People v. Lindsey* (1979), 73 Ill. App. 3d 436, 447, 392 N.E.2d 278, 286.) The standard of review in a case challenging the sufficiency of evidence has been set forth by our supreme court in *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267:

> "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' The court went on to note that, '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.) 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." (106 Ill. 2d at 261, 478 N.E.2d at 277.)

With these tenets in mind, we conclude that there is sufficient evidence to support the jury's verdict.

■ In the instant case, the jury was well aware of the weaknesses in the State's case. Michael Carter was a convicted felon who was an alcoholic and had previously used drugs. He was attending an all-night party and had his conversation with defendant at 4 or 5 a.m. Michael Carter did not come forward until nearly six months after the crime. However, six months later, Michael Carter was a different man. He had sought help for his addictions and, at the time of trial, had been attending mortuary school for 1½ years. The law is clear that a key witness' testimony is not rendered incredible by prior drug usage. (*People v. Assenato* (1991), 224 Ill. App. 3d 96, 102, 586 N.E.2d 445, 489.) Michael Carter testified defendant told him he had killed the victims with a knife and a fan, two of three instruments found at the scene. Expert testimony stated these instruments could

have caused the victims' injuries. There was no way for Michael Carter to know of these "weapons" unless defendant told him of their existence. The jury apparently chose to believe Michael Carter's testimony, and after reviewing it ourselves, we cannot say the jury's conclusion was unreasonable.

As for Michael Carter's uncle, it is clear from his testimony that he had some difficulties identifying defendant, as he did not know him prior to seeing him talking to his nephew early in the morning on Sunday, June 29, 1986. His version of what he heard or did not hear changed over time, but it is clear he saw defendant in a disheveled state in the early morning hours of June 29, 1986, a time defendant claims to have been home sick with the flu. Moreover, at trial Charles Carter testified he clearly heard defendant say he had "offed a couple of people."

Finally, Ronald Jackson was a convicted felon serving two years in the Centralia Correctional Center for deceptive practice. Conviction of theft involves dishonesty and is admissible to impeach the credibility of a witness. (*People v. Walker* (1987), 157 Ill. App. 3d 133, 510 N.E.2d 29.) Therefore, Jackson's testimony may be viewed with suspicion but cannot be said to be *per se* incredible. Jackson did not receive a reduced sentence or any compensation for his testimony. The jury was aware of Jackson's past yet found him credible.

On the other hand, defendant's alibi that he was home sick with the flu the entire weekend of June 27 through 29, 1986, was contradicted by several witnesses. First, defendant told the Alton police that he did not leave his home the entire weekend of the murders because he had no money. Second, defendant's alibi was contradicted by testimony of the State's three witnesses previously discussed. Third, a totally unbiased and credible witness, James Bizaillon, who owned an auto body shop and a used car dealership across the street from the codefendant, contradicted defendant's alibi. Bizaillon testified that he saw both Ernest Perry and defendant making a telephone call on the afternoon of Saturday, June 28, 1986. Defendant took the stand on surrebuttal and denied ever having been in Bizaillon's place of business. The impact of alibi testimony, uncontradicted or not, goes to the credibility of the witness, and that determination is reserved for the trier of fact and one for which we will not substitute our judgment. (*People v. Calhoun* (1984), 126 Ill. App. 3d 727, 738, 467 N.E.2d 1037, 1044-45.) In addition, the jury heard testimony from Karen McGuire/ Robinson, who testified that defendant visited her home two to three times per week during the summer of 1986. Ms. Robinson lived directly across the street from the victims. Her testimony contradicted

that of defendant, who testified that he had only been to Ms. Robinson's home three to four times during the entire year of 1986 and that he had never seen the victims.

In a case such as this, where the conviction was based upon circumstantial evidence, it is necessary that the evidence be of a conclusive nature and produce with reasonable and moral certainty the conclusion that defendant committed the crime. (*People v. Armstrong* (1983), 111 Ill. App. 3d 471, 475, 444 N.E.2d 276, 280.) After reviewing the record as a whole, and looking at the evidence in the light most favorable to the prosecution, we cannot say that proof is so unsatisfactory that a reasonable doubt appears.

## II

The second issue we are asked to consider is whether the trial court committed reversible error when it allowed hearsay evidence, presented by James Bizaillon, which indicated that defendant set up a drug deal on the day of the murders. Defendant argues this was reversible error because the hearsay evidence corroborated the testimony of Ronald Jackson, who testified that defendant told him that he and Ernest Perry went to the victims' residence to steal property so that they could sell the property and then use the proceeds to buy drugs. Defendant argues that this hearsay evidence denied him his right to a fair trial and therefore he is entitled to a new trial. The State responds that the testimony of James Bizaillon was not hearsay since it was not offered to prove the truth of the matter asserted but rather was offered to impeach the testimony of defendant that he was home the entire weekend of June 27 through 29, 1986. Moreover, the State asserts that any error was waived because defendant failed to object to the statement at the time it was made.

The testimony at issue appears in the record as follows:

"[KEITH JENSEN, Prosecutor] Q. Tell us what happened on that Saturday, if you would, please.

[JAMES BIZAILLON, witness] A. I was working in the rear, and I looked up and seen Ernest Perry and Thermon Smith there. I figured Ernest was using the phone. We kind of had an agreement, they could use the phone. I didn't bother them, they didn't bother me.

Q. About what time was this?

A. Somewhere around 12:30, 1:00.

Q. Were your other employees there at that time?

A. Yes.

Q. Who was there?

A. A guy by the name of Dan Murphy, and Scott Williams.

MR. MATOESIAN [defense attorney]: I'm sorry, the last name was what?

A. Scott Williams.

MR. MATOESIAN: Scott Williams?

A. Yes, sir.

MR. JENSEN: Who used the phone?

A. I believe Ernest did, but when they came over to get me, Thermon was on the phone. He was calling somebody—

MR. MATOESIAN: I will object to what he said. He didn't see—

A. One of my employees came over and got me and told me that they was talking, what the guy said—

MR. MATOESIAN: I object.

MR. JENSEN: Q. Did your employee come and tell you something at that time?

A. Yes, sir.

Q. And because of what he told you, what did you do?

A. I kicked them out of my shop, told them not to come back.

Q. When you say you kicked them out, who did you kick out?

A. I kicked Ernest and Thermon Smith out.

Q. And are you certain that was the Saturday, the weekend of the murders of Alvin Autery and Mary Irwin?

A. Yes, sir.

Q. Do the Perrys still live across from your—

A. No, sir.

Q. No further questions."

On redirect examination, the prosecutor again asked questions about why Ernest Perry and defendant were asked to leave the premises:

"REDIRECT EXAMINATION
BY MR. JENSEN:

MR. JENSEN: What did you tell Thermon Smith when you told him to leave?

THE WITNESS: I told him, don't come back, I didn't need that kind of attention around my business.

MR. JENSEN: Q. When you say that kind of attention, why did you kick him out at that time?

MR. MATOESIAN: Your Honor, I'm going to object, unless he knows firsthand.

THE COURT: Sustained.

MR. JENSEN: Q. What did you tell him as to whether he could use that phone again?

A. I told him I did not allow anybody to make dope deals on my phone.

Q. Did you tell Thermon Smith you didn't allow it?

A. Yes, sir.

Q. Did you use the word drug deals when you talked with him?

A. I believe that was the phrase.

Q. No further questions."

The record does not support the State's position that the statement was nonhearsay because it was offered only to show that defendant was not home the entire weekend of June 26 through 28, 1986. The State made this point on direct examination and was prohibited by objections from defense counsel from delving into the content of the phone conversation. Nevertheless, on redirect, the prosecutor was able to elicit the content of the conversation, which the witness did not overhear. The content of the conversation concerned a drug deal, which corroborated the motive for the crime suggested by Ronald Jackson as told to him by defendant. We agree with defendant that this was inadmissible hearsay.

■ While we agree with defendant that allowing James Bizaillon to testify that the conversation concerned a drug deal constituted an erroneous admission of hearsay, we do not agree that this error requires a reversal of defendant's conviction. Where there is no reasonable possibility that a jury would have acquitted the defendant had the hearsay evidence been excluded, the admission of such evidence is harmless error. *People v. Hall* (1980), 90 Ill. App. 3d 1073, 1077, 414 N.E.2d 201, 204.

In the instant case, the most damaging part of Bizaillon's testimony was that defendant was seen outside of his home with the codefendant on Saturday, June 27, 1986, a day which defendant claims to have never left his home. Defendant even took the stand on surrebuttal and denied ever being in Mr. Bizaillon's place of business. In light of this, and in light of the other evidence previously outlined, we do not believe the jury's verdict would have been different had the hearsay been excluded; therefore, we find its admission harmless.

III

The third issue we are asked to consider is whether the trial court erred in requiring defendant to try on a glove found at the murder scene. Defendant argues that he was prejudiced during re-cross-exam-

ination because the trial court allowed, over his objection, the State's request that defendant try on a glove found at the crime scene. Additionally, defendant contends the demonstration was beyond the scope of redirect and should not have been allowed. The State responds that the demonstration was probative and, even if it was prejudicial, any error caused by the demonstration was harmless. We agree.

The test of admissibility of evidence is whether it fairly tends to prove the particular offense charged, and any circumstances may be put into evidence which tend to make the proposition at issue more or less probable. (*People v. Peter* (1973), 55 Ill. 2d 443, 459, 303 N.E.2d 398, 408.) Physical evidence may be introduced where there is proof to connect the evidence to defendant and to the crime. *People v. Smith* (1974), 18 Ill. App. 3d 859, 867, 310 N.E.2d 734, 740; *People v. King* (1973), 10 Ill. App. 3d 847, 294 N.E.2d 300.

■ In the case at bar, the glove was found at the rear of the victims' home with blood on it. Defendant does not question the glove's admissibility but rather the court's decision granting the State's request to require defendant to try on the glove. The purpose of demonstrative evidence is not necessarily to prove an issue in the case but to aid the trier of fact in interpreting, understanding, and weighing other evidence in testimony. (*People v. Navis* (1974), 24 Ill. App. 3d 842, 321 N.E.2d 500.) The general rule is that a court has reasonable discretion in admitting or rejecting exhibits or in permitting demonstrations, and exercise of that discretion will not be interfered with unless there has been an abuse to prejudice defendant. 24 Ill. App. 3d at 848, 321 N.E.2d at 505.

Here, no fingerprints were found at the scene that did not belong to the victims. Therefore, the perpetrator(s) most likely wore something to cover fingerprints. The bloody glove could have been used in the commission of this crime, and it was up to the jury to determine its weight. The State took a calculated risk in asking defendant to try on the glove. It may not have fit. Additionally, defendant was free to argue, as he does here, that the fact that the glove fit was of no probative value because it was likely to fit thousands of others. Argument based upon the evidence presented at trial and legitimate inferences therefrom which may be deduced from that evidence are within the boundaries of proper debate. (*People v. Reyes* (1981), 102 Ill. App. 3d 820, 429 N.E.2d 1277.) We find no merit in defendant's argument that he was so severely prejudiced by being required to try on the glove that he deserves a new trial.

We also find no merit in defendant's contention that the demonstration was beyond the scope of redirect examination. The decision

to limit the scope of re-cross-examination is within the discretion of the trial court, and such a decision will not be reversible error unless it involves a clear abuse of discretion resulting in manifest prejudice to defendant. (*People v. Blackwell* (1979), 76 Ill. App. 3d 371, 378, 394 N.E.2d 1329, 1335.) As the State points out, defendant denied committing the crime in question on redirect, and we believe the demonstration was a proper impeachment tactic. We do not believe defendant suffered any undue prejudice as the result of the trial court's action in allowing the State's request to have defendant try on the glove found at the murder scene.

## IV

The next issue we are asked to address is whether it was reversible error for the prosecutor to cross-examine defendant concerning his prior convictions rather than to impeach defendant by introducing certified copies of defendant's previous convictions.

The rule is clear that impeachment of a defendant should be by means of record of conviction or an authenticated copy. (*People v. Madison* (1974), 56 Ill. 2d 476, 488, 309 N.E.2d 11, 18.) Cross-examination of a defendant as to a prior conviction is improper where direct examination has not covered the subject. (*People v. Adams* (1982), 106 Ill. App. 3d 467, 472, 435 N.E.2d 1203, 1207.) However, reversal is *not* required unless the error has deprived defendant of substantial justice or influenced the determination of his guilt. *Madison*, 56 Ill. 2d at 488, 309 N.E.2d at 18.

Here, as previously discussed, there was sufficient circumstantial evidence to establish defendant's guilt. The jury would in any event have learned of defendant's prior convictions, a proper impeachment tactic. The prosecutor did not belabor the point, asking defendant if he, in fact, had been convicted of four previous felonies. We find that the questions propounded on cross-examination pertaining to defendant's prior convictions did not constitute reversible error.

## V

The fifth issue we must consider is whether defendant's convictions and sentences for home invasion are lesser-included offenses of the murders of which defendant was convicted. Defendant argues that his convictions and sentences for home invasion must be vacated as they are lesser-included offenses of felony murder. The State responds that the murders and home invasion were separate offenses and that home invasion is not a lesser-included offense of murder.

■ In *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, our supreme court held "that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d at 566, 363 N.E.2d at 845.) We agree with our colleagues on the First District Appellate Court that the offenses of murder and home invasion constituted separate and distinct acts permitting the imposition of concurrent sentences. *(People v. Amos* (1990), 204 Ill. App. 3d 75, 83, 561 N.E.2d 1107, 1114.) We understand defendant's argument that home invasion is a lesser-included offense of felony murder; however, what defendant fails to consider is that in the instant case, the jury returned general verdicts of guilty against defendant for the murders of Alvin Autery and Mary Irwin. The trial court sentenced defendant to natural life for each of their murders and 30 years' imprisonment for the offenses of home invasion, the sentences running concurrently. We find the murders and the home invasion offenses to be separate and distinct acts *(Amos*, 204 Ill. App. 3d at 83, 561 N.E.2d at 1114) and that the trial court did not err in imposing concurrent sentences.

## VI

We now address the three additional arguments raised by defendant in his *pro se* brief. Defendant contends the trial court committed plain error when it permitted the prosecutor to ask questions of jurors on *voir dire* which informed them that defendant was in the penitentiary system at the time the instant charges were brought. Defendant also objects to the prosecutor's opening statement which alerted jurors to this fact. Defendant contends there was no legitimate reason for the prosecutor to inform prospective jurors on *voir dire* and during his opening statement that defendant was in the penitentiary other than to show defendant's propensity for crime. We disagree.

■ The prosecutor adequately explained, at the hearing on defendant's motion for a new trial, his reasons for asking questions on *voir dire* which alerted prospective jurors to the fact defendant was in the penitentiary at the time the instant charges were filed:

> "There were questions in voir dire asked of the Jurors regarding the testimony of a person in the penitentiary. I think that is a legitimate inquiry of potential Jurors to ask if they have any problems with the credibility of a person that has been in the penitentiary.

I also feel that cuts both ways in that if Mr. Smith is attempting to pick a Jury that is favorable to him, he likewise would want to know whether those Jurors are going to automatically disbelieve a person because they have been in the penitentiary or lend any less credibility.

The limited inquiry during voir dire was simply that would they have any preconceived notion or any disqualifying factors as to the credibility of a person simply because he had been in the penitentiary. There was no harping or mention or stressing the fact that Mr. Smith had been in the penitentiary. In fact that was the only way that evidence could be brought about in the fact that this conversation took place inside the Department of Corrections.

There was no prejudice attached, nor was there any mention of the crime that Mr. Smith was in jail for at the time. There was mention of the crime that the witness was in the penitentiary for and that was certainly proper in the voir dire stage.

Likewise, I don't recall any objection regarding that, nor do I recall any Motion asking that the conversation be elicited without regards to its location or how it came about.

I don't believe that there were specific remarks regarding the Defendant being incarcerated, with the exception, I do believe a remark was made that they are to judge the credibility of the witnesses the same as they would anyone else, regardless of those witnesses testifying.

The Court made its usual inquiry regarding Jurors and whether or not they felt they could believe the Defendant, whether or not they felt they could follow the burden of proof beyond a reasonable doubt. And if in fact the Defendant chose not to testify would that influence them. And I believe that each and every one of them answered that question in satisfactory form to the Court."

We agree with the prosecutor that the questions on *voir dire* concerning whether a prospective juror would automatically disbelieve a person because he was incarcerated cuts both ways. Not only was the prosecutor able to gauge the prospective juror's response, but so, too, was the defense. After reviewing the record, it is clear that there was no way around the fact that defendant was incarcerated at the time he was charged with the instant offenses. Ronald Jackson's testimony was central to the State's case. The State did not unduly prejudice defendant by discussing defendant's incarceration with prospective jurors or by bringing it up during opening statements. We find no merit

in defendant's argument that it was plain error for this fact to have been disclosed.

The next argument raised by defendant is that the trial court abused its discretion when it allowed the State to introduce into evidence a large butcher knife as the alleged murder weapon. Defendant contends there was no connection between him, the knife, and the crimes charged. We agree.

The test of admissibility of evidence is whether it fairly tends to prove the offense charged, and any circumstances may be put into evidence which tend to make the proposition at issue more or less probable. (*People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398; *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.) Physical evidence may be introduced where there is proof to connect the evidence to defendant and the crime. *People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734; *People v. King* (1973), 10 Ill. App. 3d 847, 294 N.E.2d 300.

■ In the instant case, a butcher knife was found by a boy who was snake hunting in a vacant lot. Testimony varied as to how far the lot was from the victims' home, with the closest estimation being some four blocks away. The knife underwent forensic tests at the crime lab. The presence of blood, not visible to the naked eye, was found, but because there was so little blood found, no further tests could be conducted. The pathologist, Dr. Nanduri, testified that the butcher knife or something of a similar nature could have caused the victims' injuries. Ronald Jackson testified defendant told him he had disposed of the murder weapon. No other evidence was presented connecting the butcher knife to defendant. We find the State did not sufficiently connect the knife to either defendant or the crime; thus, the knife was improperly admitted into evidence. Nevertheless, we do not find the error so grave as to require reversal of defendant's conviction or to require a new trial. *People v. Collins* (1980), 85 Ill. App. 3d 1056, 407 N.E.2d 871.

The knife was but one weapon introduced as a possible murder weapon. A bent kitchen knife, a radio, and a broken fan found at the scene were also introduced as possible murder weapons. The jury heard evidence concerning the knife and, therefore, knew of its tenuous connection to the instant crimes and defendant. The prosecutor did not dwell on the knife, and we do not believe its admission so prejudiced defendant so as to require a new trial.

The final contention raised by defendant is that he was denied effective assistance of counsel as guaranteed by both the United States and the Illinois Constitutions. U.S. Const., arts. VI, XIV.

■ In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court set the standards to be applied in cases involving specific allegations of ineffective assistance of counsel. Recognizing that it is all too easy to second-guess an attorney's performance, the *Strickland* court stated: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ***." (466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) In order to establish ineffective assistance, the defendant must show (1) that counsel's performance was deficient in that counsel committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that those errors in fact were prejudicial to his defense. (466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In the case at bar, we find that the alleged errors of defense counsel do not meet the *Strickland* standard. On the contrary, the record indicates that defense counsel conducted proper cross-examination of the witnesses, raised numerous objections, adequately presented defendant's alibi witnesses, and, overall, sought to protect defendant's interests. Defendant has not shown us that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) We conclude that defendant failed to establish ineffective assistance of counsel under the *Strickland* standard.

## VII

■ Admittedly, we have found error below; nevertheless, we find no prejudice because of these errors, either singularly or cumulatively. In our estimation, the errors do not affect the verdict or cast reasonable doubt upon defendant's guilt. Thus, with no prejudice to defendant, there is no reason to reverse the judgment of conviction. See *People v. Collins* (1980), 85 Ill. App. 3d 1056, 407 N.E.2d 871.

For the foregoing reasons, the judgments of the circuit court of Madison County are affirmed.

Affirmed.

CHAPMAN, P.J., and WELCH, J., concur.