# Illinois Official Reports

## Appellate Court

***People v. Long*, 2018 IL App (4th) 150919**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY W. LONG, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0919 |
| Filed | August 20, 2018 |
| Rehearing denied | September 17, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Calhoun County, No. 14-CF-43; the Hon. Debra L. Wellborn, Judge, presiding. |
| Judgment | Affirmed as modified; cause remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Gilbert C. Lenz, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Richard Ringhausen, State's Attorney, of Hardin (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Knecht and Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant, Timothy W. Long, was convicted of methamphetamine conspiracy (720 ILCS 646/65(a) (West 2012)) and sentenced to 30 years in prison. He appeals, arguing (1) the evidence was insufficient to prove him guilty of conspiring to manufacture the amount of methamphetamine charged by the State, (2) he was denied a fair trial by the admission of highly prejudicial other-crimes evidence, (3) he was denied a fair trial due to prosecutorial misconduct, (4) his trial counsel provided ineffective assistance, (5) the trial court erred by denying his posttrial request for a continuance to investigate whether an impaneled juror testified falsely during *voir dire*, (6) his sentence was excessive, and (7) the court abused its discretion by ordering a $5000 reimbursement for his court-appointed counsel. We reduce defendant's conviction and remand for resentencing but otherwise affirm the court's judgment.

¶ 2                                I. BACKGROUND

¶ 3        On April 29, 2015, the State charged defendant by a second amended information with unlawful methamphetamine conspiracy. *Id.* Specifically, it alleged that, on or about November 22, 2014, defendant and an individual named Michael Blumenberg agreed to manufacture methamphetamine. It further alleged defendant delivered Coleman fuel, a methamphetamine manufacturing material, to Blumenberg for that purpose, resulting in the manufacture of 486 grams of methamphetamine.

¶ 4        On May 11 and 12, 2015, defendant's jury trial was conducted. The State's evidence showed that on November 26, 2014, law enforcement officers executed a search warrant on a trailer owned by Dennis Burge. The officers discovered a "shake[-]and[-]bake meth lab" and methamphetamine manufacturing materials, including Coleman fuel. The State's evidence showed two containers of Coleman fuel were found in the trailer—one half-empty, one-gallon container that was found on the bathroom sink area and one empty, 32-ounce container that was found in a bathroom cabinet. Additionally, methamphetamine was discovered in three separate containers. Specifically, 285.5 grams of methamphetamine were found in a Gatorade bottle in the trailer's bathroom sink and two bottles containing 133 grams and 268.2 grams of methamphetamine were found in a bedroom. Both Burge and Blumenberg were present when the search warrant was executed and were arrested.

¶ 5        Sean King testified he was a special agent with the Illinois State Police and was assigned to its Meth Response Team. He participated in cleaning up the methamphetamine lab discovered in Burge's trailer and took photographs of the scene, which were admitted into evidence. King described the scene in the trailer and the process for manufacturing methamphetamine using the "shake[-]and[-]bake" method. He testified the trailer contained evidence of three "meth cooks," one in the bathroom sink and two in the trailer's bedroom. King was unable to state when the "meth cooks" occurred.

¶ 6        Sheriff's deputy Kyle Jacobs testified he investigated the "bust" of the meth lab in Burge's trailer and, on December 30, 2014, interviewed defendant. Their interview was recorded and portions of the recording were played for the jury. The record reflects that, during the interview, defendant acknowledged providing a can of Coleman fuel to Blumenberg on the day that the search warrant was executed. Defendant also acknowledged using methamphetamine in the past, previously purchasing methamphetamine from Blumenberg, and being aware that

Burge and Blumenberg had been manufacturing methamphetamine. He also admitted purchasing Sudafed, a methamphetamine manufacturing material, and discussed actions he took to make the purchase of such an item appear unrelated to the manufacture of methamphetamine. Finally, defendant acknowledged that code words were used between individuals to discuss drug-related topics.

¶ 7 On direct-examination, Jacobs testified that defendant never asserted that he gave the Coleman fuel to Blumenberg for cooking or heating purposes. On cross-examination, he acknowledged that he never specifically asked defendant why he brought the Coleman fuel to Blumenberg. However, on redirect, Jacobs also testified that defendant had been told that he was being charged with providing the Coleman fuel for "meth purposes."

¶ 8 At the time of defendant's trial, Blumenberg was an inmate in the Illinois Department of Corrections (DOC). He testified that he had been charged with manufacturing and possessing methamphetamine; however, he agreed to give a statement to the police regarding the circumstances underlying his charges, and in exchange for his statement, the manufacturing charge against him was dismissed, he pleaded guilty to an amended possession charge, and he received a six-year prison sentence. Blumenberg testified the police interviewed him three times, and he acknowledged that he provided more information each time he was interviewed. He stated he was trying to "[i]mprove [his] chances for a deal" by withholding information.

¶ 9 Blumenberg acknowledged that he was arrested at Burge's trailer and that "there was a meth cook going on at that time." He was shown a photograph of the inside of Burge's trailer and identified the "Coleman fuel jug" that was sitting on the bathroom sink as being given to him by defendant. He stated he called defendant the night before his arrest and told defendant that he "needed Coleman—[he] needed some fuel for [his] stove." Blumenberg testified he spoke in code because he was high on dope and paranoid.

¶ 10 Blumenberg stated he was living in a camper near Burge's trailer. The day of his arrest, defendant brought him the Coleman fuel and the two men went inside the camper and "smoked meth" or "ani-dope," which defendant had with him.

¶ 11 Blumenberg testified he suspected defendant had Coleman fuel because a day or two before the underlying offense defendant stated he had recently made methamphetamine. According to Blumenberg, defendant and an individual named Roy Connell went to Burge's trailer while only Blumenberg was present "to get some dope." Defendant reported that he "had just *** made some dope" but was out and wanted to buy more. Blumenberg testified he sold dope to both defendant and Connell and discussed with them that he and Burge were planning to make more methamphetamine but were "waiting on a couple ingredients." Those ingredients included Coleman fuel, which Burge was attempting to acquire. Blumenberg testified he expressly told defendant that he and Burge did not have Coleman fuel and that it was one of the ingredients being gathered. Ultimately, Burge did not obtain any Coleman fuel.

¶ 12 Blumenberg testified he made methamphetamine with defendant 12 to 15 years earlier. However, defendant's counsel objected to the testimony as being "outside the scope of 10 years," and the trial court sustained his objection.

¶ 13 On cross-examination, Blumenberg testified he had a Coleman stove in his camper. However, he denied using the stove, stating he did not know if it worked. He further stated that he called defendant the night before his arrest as well as the following morning "to make sure [defendant] was still coming." Blumenberg stated he was "out of dope" on the day of his arrest but that Burge may have had some. He testified he generally obtained more methamphetamine

by "[h]elping [Burge] make it." He acknowledged that, around the time of his arrest, he used methamphetamine "[e]very day, all day."

¶ 14    Blumenberg testified that, on the day of his arrest, he initially told the police that he was at Burge's residence because he was doing his laundry. He admitted that he lied to the police because he did not "want to get arrested for making dope." Blumenberg testified that he was aware "from the very beginning" that the police wanted information on Burge. He further admitted that he lied to the police during his second interview when he told them he had only "cooked" with Burge on one occasion.

¶ 15    Joseph Gettings testified he was currently in the custody of law enforcement. He recalled that, in December 2001, he was charged with intent to manufacture methamphetamine. Gettings testified regarding the circumstances underlying his charges, stating that he and defendant were stopped by the police while in Gettings's car. In the car, the police found methamphetamine manufacturing materials, including Coleman fuel that defendant had provided.

¶ 16    Defendant presented the testimony of Blumenberg's brother, Jeffrey, who asserted that Blumenberg owned a Coleman stove that he kept in his camper. Jeffrey identified the stove at trial and the stove was admitted into evidence. On cross-examination, Jeffrey stated he had never used the stove nor had he observed Blumenberg use the stove.

¶ 17    Sherrie Brandi Kieffer testified on defendant's behalf that she lived near Burge's trailer and could see it from her house. In November 2014, she and Burge were dating. On November 26, 2014, Kieffer went to Burge's trailer to help clean and observed Blumenberg exit a back bedroom with a Gatorade bottle that contained methamphetamine. She did not observe defendant around Burge's residence that day.

¶ 18    Defendant testified on his own behalf. He recalled that on the evening of November 25, 2014, he was working outside in his shed when Blumenberg visited with a friend. Defendant stated he had an old, rusty can of Coleman fuel in his shed with "a little bit in it." Blumenberg reported to defendant that he was out of money and asked "if he could use that can of Coleman fuel for his stove." Defendant testified he gave the can to Blumenberg but they continued to talk and Blumenberg forgot to take the can when he left.

¶ 19    The following morning, defendant was getting ready to visit his father when he received a telephone call from Blumenberg. He testified he was busy making coffee and getting ready so he put the call "on speaker phone." Blumenberg asked if defendant still had the can of Coleman fuel and said he needed the can for his stove. Defendant offered to bring the can to Blumenberg. He testified that Blumenberg also complained that he was out of money and that he "was going to be cooking on the Coleman stove." According to defendant, Connell was also present at his house when Blumenberg called and was sitting in defendant's kitchen near the phone.

¶ 20    Defendant testified that he delivered the can of Coleman fuel to Blumenberg that morning and then went to visit his father. He denied that he also smoked methamphetamine with Blumenberg that morning or that Blumenberg told him he was going to use the Coleman fuel to "cook" methamphetamine.

¶ 21    On cross-examination, defendant testified he had known Blumenberg most of his life. He admitted that he smoked methamphetamine with Blumenberg on November 25, 2014, at Burge's residence and that he paid Blumenberg $25. Defendant testified he did not think that

smoking meth was a big deal. Further, he acknowledged that he had "heard rumors" that Burge was making methamphetamine and advised Blumenberg not to hang around with Burge because of his methamphetamine-related activities. Defendant also recalled telling the police that Connell had received a text from someone saying that Burge and Blumenberg "cooked a turkey," which was code for having made methamphetamine, and he agreed that Blumenberg told him that Burge wanted to make "another batch."

¶ 22    Additionally, defendant testified that he knew how to make methamphetamine and that the ingredients included pseudoephedrine, anhydrous ammonia, drain cleaner, and Coleman fuel. He acknowledged that he had previously been convicted of burglary, manufacturing methamphetamine, and possession of anhydrous ammonia.

¶ 23    The record reflects defendant's counsel also called Connell as a witness; however, before Connell began testifying, the State advised the trial court that Connell had pending criminal charges that were connected with the factual circumstances of defendant's case. The court allowed Connell to speak with his attorney, and following that conversation, Connell elected to invoke his fifth amendment privilege against self-incrimination. The trial court then barred Connell from testifying, and the jury was instructed to disregard the fact that he was called as a witness but did not testify.

¶ 24    Following the parties' closing arguments, the jury found defendant guilty of the charged offense. On June 11, 2015, defendant filed a motion for a judgment notwithstanding the verdict or, alternatively, a new trial and other relief. On July 10, 2015, he amended his posttrial motion and, relevant to this appeal, argued the trial court erred by allowing the admission of other-crimes evidence, the State made improper arguments, his trial counsel was ineffective for failing to object to various alleged errors, and he was not proven guilty beyond a reasonable doubt because no evidence showed that the Coleman fuel he furnished to Blumenberg resulted in any of the methamphetamine seized from Burge's trailer.

¶ 25    On August 12, 2015, the trial court called the matter for hearing on defendant's posttrial motion and for sentencing. Initially, however, defendant's counsel requested a continuance to investigate "a rumor" regarding one of defendant's jurors. Counsel explained that the "source" of the rumor was an excused juror named Sheila Prokuski. He asserted he personally met with Prokuski at a restaurant she owned and Prokuski reported that a juror named Maggie Smith "often attended coffee at [Prokuski's] restaurant with relatives of" Blumenberg and Burge. Defendant's counsel stated Prokuski further stated as follows:

        "That, in fact, following the bust, if you will, of Burge and Blumenberg, that they—let's just call them the panel, if you will, of people who would sit around this table, which would include *** [Smith], would discuss the case ***. Once [defendant] was arrested, [defendant's] name was mentioned on more than one occasion in the presence of *** Smith."

Counsel asserted that, during *voir dire*, Smith acknowledged knowing potential witnesses or their family members, that she had "coffee with the grandparents," and that she heard "hearsay" about something other than defendant's particular case. Defendant's counsel further asserted that he had hired an investigator to interview Smith but the investigator had not yet done so.

¶ 26    The State objected to defendant's request for a continuance, and the trial court denied his request. In so holding, the court noted that it recalled the *voir dire* questioning of both Smith and Prokuski and that Smith indicated "she had not particularly heard about" defendant's case

while Prokuski herself did not candidly answer questions posed to her by the court. It also found the concerns regarding Smith as a juror could have been followed up on earlier and noted the matter was "now three months from the trial date."

¶ 27 The trial court next addressed and heard arguments relative to defendant's posttrial motion. Ultimately, the court denied the motion and proceeded with defendant's sentencing. The court noted that it had reviewed defendant's presentence investigation report, which showed defendant had a criminal history that included numerous felony convictions and previous prison sentences to DOC. Defendant presented the testimony of two witnesses and gave a statement in allocution. The court then sentenced him to 30 years in prison and imposed a $10,000 fine.

¶ 28 Finally, at the conclusion of defendant's sentencing hearing, the trial court conducted a hearing on its own motion to determine the amount of payment owed by defendant for his court-appointed counsel. The court questioned defendant and noted that defense counsel had submitted a bill totaling $9911. The court, however, reduced defense counsel's bill to $6471 based upon its own calculation of a reasonable number of hours spent on defendant's case and what it found to be a "standard rate" for appointed counsel. It then noted that it had statutory authority to order a reimbursement "up to [$5000] for a felony." The court also considered "the bond that was posted," which the record reflects was $15,000 posted by defendant's father. It then ordered a $5000 reimbursement fee.

¶ 29 On September 8, 2015, defendant filed a motion to reconsider his sentence, arguing the trial court failed to give appropriate weight to mitigating factors, his sentence was disproportionate to Blumenberg's six-year sentence, it was error to sentence him for allegedly conspiring to manufacture between 400 and 900 grams of methamphetamine because the State failed to prove that the Coleman fuel he provided resulted in the production of any quantity of methamphetamine, and the fine imposed by the court was excessive. On November 6, 2015, the court conducted a hearing on defendant's motion and denied it.

¶ 30 This appeal followed.

¶ 31                                             II. ANALYSIS
¶ 32                                    A. Sufficiency of the Evidence
¶ 33 On appeal, defendant first argues the evidence presented at his trial was insufficient to prove him guilty of methamphetamine conspiracy as charged by the State. Specifically, he points out that the State alleged he conspired to manufacture 400 to 900 grams of methamphetamine, a Class X felony with an applicable sentencing range of 12 to 50 years in prison. 720 ILCS 646/15(a)(2)(D) (West 2012). Defendant argues, however, that the State's evidence failed to establish the quantity of methamphetamine that "was actually attributable to [the charged] conspiracy." Although he acknowledges that a total amount of over 400 grams of methamphetamine was found in Burge's trailer in three separate containers, he contends the evidence failed to show that all, or any, of that methamphetamine was attributable to the alleged conspiracy and the Coleman fuel he gave to Blumenberg.

¶ 34 As relief, defendant asks this court to "reduce [his] conviction" to the "general" form of the offense, a Class 1 felony based on the manufacture of less than 15 grams of methamphetamine (*id.* § 15(a)(2)(A)), and remand for resentencing. Alternatively, he asks that, in the event this court finds a portion of the methamphetamine was attributable to the conspiracy, this court

reduce his conviction to conspiracy to manufacture 100 to 400 grams of methamphetamine, a Class X felony with an applicable sentencing range of 9 to 40 years in prison (*id.* § 15(a)(2)(C)).

¶ 35 In response to defendant's claim, the State concedes that it failed to prove beyond a reasonable doubt that two of the methamphetamine "cooks," specifically, the two "cooks" seized from the bedroom in Burge's trailer, were attributable to the conspiracy involving defendant. However, it contends the evidence was sufficient to support a reasonable inference that the 285.5 grams of methamphetamine found in the trailer's bathroom sink were attributable to defendant's conspiracy. Thus, although it agrees with defendant that his conviction should be reduced and the case remanded for resentencing, it maintains his alternative request for relief should be granted and that defendant should still be sentenced as a Class X offender based on "the manufacture of 100 or more grams but less than 400 grams of methamphetamine." *Id.*

¶ 36 Under the Methamphetamine Control and Community Protection Act (Act), "[a] person engages in a methamphetamine conspiracy when" the following circumstances exist:

"(1) the person intends to violate one or more provisions of th[e] Act;

(2) the person agrees with one or more persons to violate one or more provisions of th[e] Act; and

(3) the person or any party to the agreement commits an act in furtherance of the agreement." *Id.* § 65(a).

In this case, the State alleged defendant was engaged in a methamphetamine conspiracy because he agreed with Blumenberg to participate in methamphetamine manufacturing, a violation of section 15(a)(1) of the Act (*id.* § 15(a)(1) ("It is unlawful to knowingly participate in the manufacture of methamphetamine with the intent that methamphetamine or a substance containing methamphetamine be produced.")).

¶ 37 The Act further provides that a person who engages in a methamphetamine conspiracy "shall face the penalty for the offense that is the object of the conspiracy" and that the person "may be held accountable for the cumulative weight of any methamphetamine, substance containing methamphetamine, methamphetamine precursor, or substance containing methamphetamine precursor attributable to the conspiracy for the duration of the conspiracy." *Id.* § 65(b). As indicated, the object of the conspiracy in this case was a violation of section 15(a)(1) of the Act, *i.e.*, participation in methamphetamine manufacturing. Relative to the facts and arguments presented in this case, a violation of section 15(a)(1) carries the following penalties:

"(A) A person who participates in the manufacture of less than 15 grams of methamphetamine or a substance containing methamphetamine is guilty of a Class 1 felony.

\*\*\*

(C) A person who participates in the manufacture of 100 or more grams but less than 400 grams of methamphetamine or a substance containing methamphetamine is guilty of a Class X felony, subject to a term of imprisonment of not less than 9 years and not more than 40 years, and subject to a fine not to exceed $200,000 or the street value of the methamphetamine manufactured, whichever is greater.

(D) A person who participates in the manufacture of 400 or more grams but less than 900 grams of methamphetamine or a substance containing methamphetamine is guilty of a Class X felony, subject to a term of imprisonment of not less than 12 years and not more than 50 years, and subject to a fine not to exceed $300,000 or the street value of the methamphetamine manufactured, whichever is greater." *Id.* § 15(a)(2).

¶ 38    "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. Additionally, any fact that increases the range of penalties for a crime is considered an element of the charged offense and must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Alleyne v. United States*, 570 U.S. 99, 103 (2013) ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."). In this instance, not only was the State required to prove that defendant intended and agreed with Blumenberg to participate in methamphetamine manufacturing and that one of the conspirators committed an act in furtherance of the agreement, it also had to prove the amount of methamphetamine attributable to the conspiracy.

¶ 39    Here, we agree with the parties that the evidence failed to establish that all of the methamphetamine discovered in Burge's trailer was attributable to the conspiracy involving defendant. In particular, although Blumenberg testified he was out of methamphetamine on, or immediately prior to, November 26, 2014, he acknowledged that Burge might have still been in possession of some. Any methamphetamine already in Burge's possession had to have been manufactured prior to defendant's delivery of the Coleman fuel and could not be attributable to defendant's agreement with Blumenberg.

¶ 40    Nevertheless, we also agree with the State's position that it presented sufficient evidence to show that at least one of the methamphetamine "cooks" discovered in the trailer on November 26, 2014, was attributable to the conspiracy at issue. Evidence was presented that Blumenberg and Burge intended to manufacture methamphetamine but were out of Coleman fuel and, immediately prior to November 26, 2014, were attempting to obtain that necessary methamphetamine manufacturing ingredient. On the morning of November 26, 2014, defendant delivered Coleman fuel to Blumenberg. Later that day, the police executed a search warrant on Burge's trailer, and according to Blumenberg, "there was a meth cook going on at that time." Evidence further showed that three methamphetamine "cooks" were discovered in Burge's trailer. While two of the "cooks" were located in the trailer's bedroom, one was located in the bathroom sink and was found to contain 285.5 grams of methamphetamine. In fact, all three methamphetamine "cooks" each contained over 100 grams of methamphetamine.

¶ 41    A reasonable inference from the evidence presented is that at least one of the methamphetamine "cooks" found in Burge's trailer occurred on November 26, 2014, after Blumenberg received the Coleman fuel from defendant. Further, because Blumenberg and Burge had no other Coleman fuel on or immediately prior to November 26, 2014, the "cook" that occurred that day had to have been accomplished through the use of the Coleman fuel provided by defendant. A reasonable inference may also be made that the methamphetamine

"cook" found in the bathroom sink and in close proximity to the Coleman fuel provided by defendant was the "cook" that occurred on November 26, 2014. Thus, the 285.5 grams of methamphetamine associated with that "cook" were attributable to the conspiracy.

¶ 42      Defendant points out that Blumenberg never testified that he used the fuel provided by defendant in the "batch" of methamphetamine he made shortly before his arrest, suggesting that such testimony was necessary to establish a connection between defendant and the methamphetamine found in the trailer. We disagree. As stated, Blumenberg's testimony showed he and Burge were out of Coleman fuel until defendant delivered fuel to them on November 26, 2014. Thus, any methamphetamine made on that date is necessarily attributable to the fuel provided by defendant.

¶ 43      Defendant also contends that, to establish the quantity of drugs attributable to the conspiracy, the State was required to present evidence regarding how much fuel defendant provided and how much fuel is required to manufacture methamphetamine. He cites *United States v. Anderson*, 236 F.3d 427, 429-30 (8th Cir. 2001), to support his position. However, as the State points out, that case involved the seizure of only a methamphetamine precursor. *Id.* at 429. Expert testimony was then presented regarding the quantity of drugs that could theoretically be made from the amount of the precursor that was seized. *Id.* In this case, evidence of an actual yield was presented, rendering evidence of a theoretical yield unnecessary. To establish a connection between the fuel provided by defendant and the methamphetamine found in the trailer, it was enough that the State presented evidence showing that Coleman fuel was a necessary methamphetamine manufacturing ingredient, Blumenberg and Burge had no Coleman fuel before being given fuel by defendant, and Blumenberg "cooked" methamphetamine after defendant's delivery of fuel.

¶ 44      Here, the evidence sufficiently established that 100 to 400 grams of methamphetamine was attributable to the conspiracy involving defendant rather than the 400 to 900 grams charged by the State. As a result, we accept the relief suggested by the parties and reduce defendant's conviction to the offense of methamphetamine conspiracy based on his participation in the manufacture of 100 or more grams but less than 400 grams of a substance containing methamphetamine (720 ILCS 646/15(a)(2)(C) (West 2012)) and remand for resentencing. See Ill. S. Ct. R. 615(b)(3) (eff. Apr. 26, 2012) (providing that a reviewing court may "reduce the degree of the offense of which the appellant was convicted").

¶ 45                                B. Other-Crimes Evidence

¶ 46      Defendant next argues he was denied a fair trial by the admission of methamphetamine-related, other-crimes evidence. He contends such evidence was admitted for an improper purpose, *i.e.*, to persuade the jury that he had a propensity to commit methamphetamine-related offenses, and he maintains the evidence was "highly prejudicial."

¶ 47      "Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11, 998 N.E.2d 1247. In particular, other-crimes evidence is admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, even where evidence of other crimes is offered for a permissible purpose, it should not be admitted if the prejudicial impact of the evidence substantially outweighs its probative value. *People v. Chapman*, 2012 IL 111896, ¶ 19, 965 N.E.2d 1119; see also *People v. Cloutier*, 156 Ill. 2d 483, 505, 622 N.E.2d 774, 786

(1993) ("[O]ther-crimes evidence is admissible, if relevant and not unduly prejudicial, to show anything other than a defendant's mere propensity to commit a crime."). The trial court has discretion regarding the admissibility of other-crimes evidence, and its ruling will not be disturbed on review absent a clear abuse of that discretion. *Id.* at 507.

¶ 48    On appeal, defendant argues that the improperly admitted other-crimes evidence included testimony from Blumenberg that defendant (1) stated he made methamphetamine in the past, (2) possessed "ani-dope," which defendant and Blumenberg smoked on the day of the alleged offense, and (3) manufactured methamphetamine with Blumenberg 12 to 15 years earlier. He further contends that improper other-crimes evidence was admitted through his recorded interrogation, portions of which were played for the jury. Specifically, defendant complains that he was shown discussing (1) his personal use of methamphetamine; (2) individuals he knew who were involved in manufacturing methamphetamine; and (3) his purchase of Sudafed, a methamphetamine-making material, and how to make the possession of such material appear unconnected to methamphetamine manufacturing.

¶ 49    Here, defendant acknowledges that he failed to properly preserve all but two of his claims of error for appellate review. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988) (holding that to preserve an issue for appellate review, a defendant must both make a trial objection and raise the issue in a written posttrial motion). However, he contends the admissibility of such evidence constituted first-prong plain error, and thus, this court may reach the merits of his claim. Pursuant to the plain error doctrine, a defendant's procedural default may be excused in two instances:

> "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675.

"The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Id.* ¶ 49.

¶ 50    As to defendant's claims, we first find no error with respect to his assertion that the trial court improperly admitted evidence that there were "others he knew who were involved with methamphetamine." It was not a crime for defendant to have knowledge that other people were engaged in methamphetamine-related activities, and thus, an other-crimes analysis is simply inapplicable to such evidence.

¶ 51    Second, defendant includes within his claims of error evidence to which his counsel raised an objection at trial and the objection was sustained. Specifically, the record shows the State questioned whether Blumenberg "ever participated in making meth with" defendant and Blumenberg responded that he had, approximately 12 to 15 years earlier. Defendant's counsel objected on the basis that the evidence was "outside the scope of 10 years" and the trial court sustained the objection. Although the jury was not immediately admonished to disregard the evidence, and defense counsel did not request such an admonishment, the record indicates the jury was ultimately instructed to disregard matters that were the subject of a sustained objection and only consider evidence the court had received. Given these circumstances, no error occurred because the challenged testimony was not admitted into evidence. Additionally, the record fails to show prejudice to defendant. See *People v. Martinson*, 89 Ill. App. 3d 66, 68,

411 N.E.2d 360, 361 (1980) ("[N]o prejudice attached to [the] defendant from the questions asked, as an objection was sustained, and the jury was given a general instruction to disregard such testimony.").

¶ 52　　Third, defendant contends error occurred regarding the admission of evidence related to his prior purchase of Sudafed, and he maintains that the issue was properly preserved for review. The record shows, at trial, defendant objected to the evidence on the basis that it was irrelevant, and in his posttrial motion, he argued that it was both irrelevant and highly prejudicial. Given these circumstances, we accept defendant's contention that the issue was not forfeited.

¶ 53　　Nevertheless, addressing the merits of this particular claim, we can find no error. In overruling defendant's relevancy objection to the Sudafed evidence, the trial court found that it was "relevant to proving the intent to [commit] the conspiracy." It further stated that "evidence of knowledge of the products [used to manufacture methamphetamine] in total and their use is relevant to the conspiracy." As stated, other-crimes evidence may be relevant for the purposes of showing intent and knowledge. See also *People v. Wilson*, 214 Ill. 2d 127, 136, 824 N.E.2d 191, 196 (2005) ("Other-crimes evidence may *** be permissibly used to show, by similar acts or incidents, that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge."). Here, defendant's statement regarding his purchase of Sudafed and the methods used to make such a purchase appear unconnected with methamphetamine manufacturing helped establish his knowledge of methamphetamine manufacturing procedures and intention to engage in the alleged conspiracy. Thus, it held probative value. Further, on the record presented, we do not find that the evidence was so prejudicial that its probative value was substantially outweighed.

¶ 54　　Moreover, even assuming the evidence was improperly admitted, we would find no reversible error. "While the erroneous admission of other-crimes evidence carries a high risk of prejudice and ordinarily calls for reversal [citation], the evidence must be so prejudicial as to deny the defendant a fair trial, *i.e.*, it must have been a material factor in his conviction such that without the evidence the verdict likely would have been different." *People v. Cortes*, 181 Ill. 2d 249, 285, 692 N.E.2d 1129, 1145 (1998); see also *People v. Nieves*, 193 Ill. 2d 513, 530, 739 N.E.2d 1277, 1285 (2000) ("[The supreme] court repeatedly has held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission."). "If the error is unlikely to have influenced the jury, admission will not warrant reversal." *Cortes*, 181 Ill. 2d at 285.

¶ 55　　Here, we cannot find that the challenged evidence was a material factor in defendant's conviction or that a different verdict would have resulted without it. The undisputed evidence showed that defendant knew Coleman fuel was a methamphetamine manufacturing ingredient and that Blumenberg and Burge had been making methamphetamine. According to Blumenberg, shortly prior to November 26, 2014, defendant knew that Blumenberg and Burge intended to make more methamphetamine but were out of Coleman fuel and trying to obtain that ingredient. The undisputed evidence also showed that defendant delivered Coleman fuel to Blumenberg on November 26, 2014. That same day, Blumenberg "cooked meth" at Burge's trailer. The police executed a search warrant and discovered methamphetamine near a half-empty container of Coleman fuel that Blumenberg testified was given to him by defendant.

¶ 56　　Ultimately, the State presented strong evidence of defendant's guilt. Thus, the challenged evidence was unlikely to have influenced the jury and no reversible error occurred.

¶ 57　　Finally, the remaining other-crimes evidence challenged by defendant includes testimony from Blumenberg and statements from defendant about defendant's personal drug use, as well as Blumenberg's testimony that defendant stated he had recently made methamphetamine. Defendant acknowledges that he forfeited his claims of error as to this evidence. However, as stated, he maintains that, pursuant to the plain-error doctrine, clear and obvious errors occurred in the admission of the evidence and that reversal is warranted because the evidence was otherwise closely balanced. We disagree. Like before, evidence of defendant's methamphetamine-related activities was relevant to show his intent and knowledge with respect to the charged conspiracy. Further, even assuming that the challenged evidence was improperly admitted, a review of the record fails to reflect that the evidence was closely balanced. As discussed above, the State presented strong evidence of defendant's guilt. The record does not support a finding that the alleged errors in the admission of the challenged evidence "alone threatened to tip the scales of justice." As a result, defendant has failed to demonstrate plain error.

¶ 58　　　　　　　　　　　　　C. Prosecutorial Misconduct

¶ 59　　On appeal, defendant further argues that the prosecutor's conduct during each stage of his trial was improper and denied him a fair trial. He contends that the prosecutor improperly argued facts that were not in evidence, denigrated his character, vouched for Blumenberg's credibility, and created an "us-versus-them" mentality with the jury. Again, defendant has acknowledged that these issues were not properly preserved for appeal; however, he maintains this court may review the issues he raises for plain error.

¶ 60　　"[A] pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine." *People v. Johnson*, 208 Ill. 2d 53, 64, 803 N.E.2d 405, 412 (2003). Pervasive prosecutorial misconduct that encourages a jury to return a verdict grounded in emotion rather than rational deliberation of the facts of the case adversely affects a defendant's right to a fair trial and qualifies as a structural defect. *Id.* at 84-85. Additionally, such misconduct "undermines the trustworthiness and reputation of the judicial process, affecting the very integrity of the judicial process itself." (Internal quotation marks omitted.) *Id.* at 85. Here, defendant complains that prosecutorial misconduct occurred at every level of the underlying proceedings and denied him his right to a fair trial.

¶ 61　　　　　　　　　　　　　1. Opening Statement

¶ 62　　Defendant contends two instances of prosecutorial misconduct occurred during the State's opening statement. Generally, during his or her opening statement, a prosecutor "is allowed to comment on what the expected evidence will be and reasonable inferences therefrom." *Cloutier*, 156 Ill. 2d at 507. "Absent deliberate misconduct, incidental and uncalculated remarks in opening statement cannot form the basis of reversal ***." *Id.* Reversal is not required on the basis of prosecutorial remarks unless there is "substantial prejudice" to the defendant "such that the result would have been different absent the complained-of remark." *Id.*

¶ 63　　First, defendant argues the prosecutor improperly attempted to create an "us-versus-them" mentality by placing himself and the jury on the same side and in opposition to defendant. He challenges the following comments by the prosecutor:

"What we are going to present is evidence that there are two communities in Calhoun County. One is the ordinary, go about your job, raise your family, community, and then existing side by side with that there is a community of methamphetamine in Calhoun County.

That community involves people that make it, people that buy it, people that sell it, people that use it. And what the evidence is going to show is that's a tight-knit community where everybody helps each other for the benefit of maintaining that system."

¶ 64 In *Johnson*, 208 Ill. 2d at 80, the supreme court held that arguments that "seek to engender an 'us-versus-them' mentality" are "inconsistent with the inherent principles of the criminal trial process." In particular, such arguments are " 'a perversion of the principle that a jury is composed of nonpartisans who function under the presumption that a defendant is innocent until proved otherwise.' " *Id.* (quoting *People v. Thomas*, 146 Ill. App. 3d 1087, 1089, 497 N.E.2d 803, 804 (1986)). In *Johnson*, the following prosecutorial comments were deemed improper:

" 'We as a society do not have to live in their twisted world. We do not have to accept their values. We don't have to allow that to happen in our community. We don't have to allow these guys blasting sawed off shotguns at other human beings. We as a people can stand together ***.' " *Id.* at 79.

¶ 65 The State argues the prosecutor's comments in this case are distinguishable from those presented in *Johnson* and were based on a reasonable inference drawn from Blumenberg's description of the underlying events. We agree with the State. The comments of the prosecutor in this case fall far short of what occurred in *Johnson*. Specifically, here, the prosecutor commented on two separate communities but did not otherwise use language that aligned or merged himself with the jury and against defendant. Additionally, evidence was presented at defendant's trial that several individuals, *i.e.*, a group or community of individuals, were involved in connected methamphetamine-related activities. Thus, the record reflects the prosecutor permissibly commented on what the evidence was expected to show at trial, and we find no error as alleged by defendant.

¶ 66 Second, defendant maintains the prosecutor misstated evidence "by exaggerating *** improper other-crimes evidence." In particular, he contends the prosecutor erroneously asserted defendant bought Sudafed "in 96-count packs" and on "multiple occasions." Defendant argues "[i]t is improper for a prosecutor to comment on what evidence will be introduced and then fail to produce the evidence." *People v. Helton*, 195 Ill. App. 3d 410, 417, 552 N.E.2d 398, 403 (1990).

¶ 67 Initially, as already discussed, we do not find the Sudafed-related evidence was improper other-crimes evidence as argued by defendant. Further, we find the prosecutor's comments on the Sudafed evidence were substantially similar to the evidence that was ultimately presented at trial. In context, the prosecutor remarked as follows with respect to that evidence:

"When [Blumenberg] had told [defendant] that he needed Coleman [fuel], [defendant] had said, well, the Coleman [fuel] was in his shed. [Defendant] talked about him and Roy Connell buying Sudafed in 96-count packs. Now, Sudafed, as I said, is one of those ingredients that is an innocent item that you can possess legally.

So, what [defendant] tells the police is that, and he's not charged with delivering the Sudafed, he's charged with delivering Coleman fuel, but he's telling the officers how you cover an innocent purchase."

¶ 68    At trial, the evidence showed defendant acknowledged that he and Connell had purchased Sudafed in the past and that defendant described the actions he took to make his purchase appear that it was not for the purpose of manufacturing methamphetamine. Contrary to defendant's assertion on appeal, there was no unsupported assertion by the prosecutor that defendant purchased Sudafed on "multiple occasions." Additionally, although the evidence at trial did not include the quantity of Sudafed purchased by defendant in the past, we find that fact was incidental and insignificant to the issues and arguments presented in the case. Thus, even if we can find error in the prosecutor's description of the Sudafed as being "in 96-count packs," defendant could not have suffered prejudice.

¶ 69                          2. Examination of Witnesses
¶ 70            a. Asking a Witness to Vouch for the Credibility of Another Witness
¶ 71    Defendant contends several instances of prosecutorial misconduct occurred during the prosecutor's examination of witnesses. First, he complains that the prosecutor improperly asked Jacobs to vouch for Blumenberg's credibility.

¶ 72    As noted by defendant, "[u]nder Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness." *People v. Becker*, 239 Ill. 2d 215, 236, 940 N.E.2d 1131, 1143 (2010). After reviewing the challenged testimony in this case, we find no violation of above-cited principle.

¶ 73    On direct examination, the prosecutor questioned Jacobs regarding his interview with Blumenberg and elicited the following testimony:
        "Q. Is it unusual for a [criminal suspect] to initially tell you one story and then tell you a different one afterwards?
        A. It happens all the time.
        Q. As a rule, based on your training and experience, do the statements become more accurate or less so as time goes on?
        A. Much more accurate."
The State then questioned Jacobs regarding the date of his last interview with Blumenberg and elicited testimony that, at the time of that final interview, Blumenberg had been in custody for six months. The following colloquy then occurred:
        "Q. So, within a several month period where he would not have had access to meth, [beer, wine, alcohol], or any other controlled substance?
        A. That's correct.
        Q. So he, in theory, would have been sober, straight[-]headed during that interview?
        A. Absolutely."

¶ 74    The record shows that, upon questioning by the State, Jacobs first offered an opinion regarding the accuracy, over time, of statements given to him by criminal suspects. The posed questions, and Jacobs' responses, were general and not specific to Blumenberg. Although the prosecutor next elicited testimony from Jacobs about Blumenberg's sobriety after a period of

custody, he did not ask Jacobs to comment directly on Blumenberg's credibility, nor did Jacobs do so. Thus, we disagree with defendant's characterization of Jacobs' testimony and find no error.

¶ 75                     b. Bolstering Witness Credibility With Prior Consistent Statement

¶ 76        Defendant further argues that the State improperly bolstered Blumenberg's credibility by eliciting testimony that his third and final statement to the police was consistent with his trial testimony. Evidence of a witness's prior consistent statement is inadmissible to corroborate the witness's trial testimony "unless it has been suggested that the witness recently fabricated testimony or has a motive to testify falsely and the prior statement was made before the motive arose." *People v. Caffey*, 205 Ill. 2d 52, 110, 792 N.E.2d 1163, 1199-200 (2001).

> "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." (Internal quotation marks omitted.) *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 60, 68 N.E.3d 986.

¶ 77        At trial, the prosecutor questioned Blumenberg regarding his interviews with the police. Blumenberg agreed he was interviewed three times and gave more information to the police during each interview. The following colloquy then occurred between the prosecutor and Blumenberg:

> "Q. The final time when—when your attorney struck a deal for six years[—]was when you actually gave the most detailed statement, is that correct?
>
> A. Yes.
>
> Q. Obviously, you gave that statement because you were receiving a lesser sentence. You understand that you have the obligation to tell the truth, then and now.
>
> A. Yes.
>
> Q. And the fact that you received a lesser sentence, I guess my question is, did that cause you to make that up or was what you told the police the truth?
>
> A. I told them the truth.
>
> Q. You did not tell them the full truth the first time or the second time, though, correct?
>
> A. Correct.
>
> Q. You withheld some of that information?
>
> A. Yes.
>
> Q. And was that essentially because, ultimately, you wanted to try to get a better deal?
>
> A. Yeah."

¶ 78        Here, the State elicited testimony from Blumenberg that he had given a prior statement to police that was consistent with his trial testimony. In particular, Blumberg testified he previously gave a statement to the police that was "the truth," and he acknowledged that he had an obligation to tell the truth at the time he gave that statement and at trial. Further, as argued by defendant, neither exception for the admission of a prior consistent statement applies in this case. Although the State suggests that defense counsel implied recent fabrication in his

opening statement by asserting Blumenberg "honed his story," the record reflects defense counsel's argument was directed to the third statement Blumenberg gave the police and not solely to his trial testimony.

¶ 79    In any event, where the actual substance of a witness's prior statement is not introduced into evidence, there is otherwise substantial evidence of the defendant's guilt, and testimony regarding the prior consistent statement amounts to a "mere acknowledgement" of having made the prior consistent statement, the defendant does not suffer prejudice and application of the plain error rule is unwarranted. *People v. Williams*, 264 Ill. App. 3d 278, 288-89, 636 N.E.2d 630, 637 (1993) (distinguishing cases where admission of a prior consistent statement was reversible error). Here, the substance of Blumenberg's prior consistent statement was not introduced at trial. Rather, evidence of such a prior statement was exceedingly minimal and amounted to a "mere acknowledgment" that it had been made. Moreover, as discussed, the State presented strong evidence of defendant's guilt. Under such circumstances, the "danger" posed by prior consistent statements was not realized and defendant suffered no prejudice.

¶ 80                        c. Irrelevant Cross-Examination

¶ 81    Defendant also argues the prosecutor acted improperly by attempting to impugn his character through irrelevant questioning. See *People v. Redmond*, 50 Ill. 2d 313, 315, 278 N.E.2d 766, 768 (1972) (stating "questions concerning whether the defendant was 'lazy' or 'shiftless' were clearly objectionable because they concerned character traits that were not relevant to the crime charged"). Specifically, he notes that, during his cross-examination, the State elicited testimony from him that he smoked methamphetamine with Blumenberg in Burge's trailer and did not think "smoking meth" was "a big deal." Further, he notes that during closing arguments, the prosecutor referenced that testimony and asserted it showed defendant's "arrogance *** towards the law."

¶ 82    In this instance, given that defendant was charged with conspiring to participate in methamphetamine manufacturing, we cannot agree that his attitude toward methamphetamine use was wholly irrelevant. See *People v. Williams*, 161 Ill. 2d 1, 33, 641 N.E.2d 296, 309 (1994) (finding "inquiries into [the] defendant's lack of income and assets were relevant to establish a financial motive for [the] defendant's agreement to commit the murder"). Rather, such evidence was pertinent to the issues of motive and intent to enter into an agreement with Blumenberg. The case authority relied upon by defendant is clearly distinguishable and, again, we find no error.

¶ 83                        d. Improper Impeachment

¶ 84    Finally, defendant argues the prosecutor improperly impeached him with his prior convictions. He maintains that the trial court only permitted impeachment with one prior conviction, a 2008 conviction for burglary, and the State improperly impeached him with a second conviction, a 2001 conviction for a methamphetamine-related offense. Defendant also contends the State improperly introduced his prior convictions through cross-examination and misstated the evidence during closing argument by asserting that three prior convictions had been presented.

¶ 85    Initially, we note that, as pointed out by the State, the record clearly refutes defendant's claim that the trial court only permitted the State to impeach him with his 2008 burglary conviction. Prior to trial, the State identified four potential prior convictions that could be used

for impeachment purposes—a 2001 conviction related to the manufacture of methamphetamine, a 2004 conviction for "transport of anhydrous [ammonia]," a 2008 conviction for aggravated domestic battery, and a 2008 conviction for burglary. During a pretrial hearing on May 7, 2015, the trial court ruled that the 2008 burglary conviction, but not the 2008 aggravated domestic battery conviction, could be used for impeachment. At the time, it postponed ruling on the remaining two convictions.

¶ 86     The following day, May 8, 2015, the trial court entered a docket entry stating that the defendant's 2001 and 2004 drug-related convictions could also be used for impeachment purposes. The same day, the court entered a written order setting forth its decision and stating as follows:

> "The Court having heard the arguments of Counsel as to the portion of Defendant's Motion *in Limine* to exclude use of Defendant's prior convictions for impeachment at trial and having reviewed the applicable law, ORDERS;

> That PROVIDED the convictions otherwise meet the time and punishment qualifications [citation], the motion is denied and the prior convictions from 2001 and 2004 for Manufacture of a Controlled Substance and for Tampering with Anhydrous Ammonia Equipment [*sic*] may be used to impeach the Defendant.

> The Court has considered the remoteness in time to this trial, the subsequent additional convictions of the Defendant and that convictions for these types of drug[-]related offenses can be taken to show that a person who participates in these offenses does so by dishonest and evasive means. All of these factors are relevant to the continuous potential for testimonial deceit. Such offenses would relate to Defendant's veracity."

¶ 87     Defendant maintains that the trial court orally ordered that only defendant's 2008 burglary conviction could be used for impeachment and its oral ruling must control over its conflicting written docket entry (and although not argued by defendant, the court's written order). See *People v. Roberson*, 401 Ill. App. 3d 758, 774, 927 N.E.2d 1277, 1291 (2010) ("When the oral pronouncement of the court and the written order conflict, the oral pronouncement of the court controls."). However, the record fails to reflect any conflicting orders and quite clearly shows the court permitted impeachment with defendant's burglary conviction *and* his two drug-related convictions.

¶ 88     We note defendant also maintains that the State expressly asserted it did not intend to use defendant's 2001 methamphetamine-related conviction for impeachment. To support his contention, defendant cites to portions of the record wherein the parties and the trial court discussed a request by the State to have the circumstances surrounding defendant's 2001 conviction admitted as relevant other-crimes evidence, *i.e.*, substantive evidence presented by the State in its case-in-chief rather than as impeachment following defendant's election to testify. These bases for admission of evidence are not the same, and it is apparent from the record that the court made separate rulings as to each basis. Further, statements by the prosecutor that he was not seeking the admission of the 2001 offense for impeachment were confined to the context in which they were made. In other words, the prosecutor was simply clarifying the argument he was making at the time—that the evidence should be admitted as relevant other-crimes evidence.

¶ 89     Moreover, contrary to defendant's assertion on appeal, the record shows that, at trial, the State used the burglary *and* the two drug-related convictions to impeach defendant, asking

about each conviction during defendant's cross-examination—although mistakenly indicating that both drug-related convictions occurred in 2001. Specifically, the following colloquy occurred between the prosecutor and defendant:

> "Q. *** [Defendant], you were convicted of burglary in Calhoun County in [case No. 08-CF-10] in 2008, is that correct?
>
> A. Yes, sir.
>
> Q. And you were convicted in 2001 in Greene County, manufacture of controlled substances?
>
> A. Yes, sir.
>
> Q. Related to methamphetamine?
>
> A. Yes, sir.
>
>           * * *
>
> Q. *** You were convicted of unlawful possession of anhydrous ammonia at that time, correct?
>
> A. Yes, sir."

Thus, as the record supports a finding that the State used three convictions to impeach defendant, the prosecutor did not misstate the evidence in his closing argument when he referenced impeachment by three convictions.

¶ 90      Finally, as stated, defendant also contends that the prosecutor acted improperly by impeaching him with his prior convictions during cross-examination. The State concedes that clear or obvious error occurred in this respect but asserts the error did not deprive defendant of substantial justice or affect the outcome of the case. We agree with the State.

¶ 91      "The general rule is that it is improper to cross-examine a defendant about a prior conviction even where the conviction has been properly introduced into evidence." *People v. Coleman*, 158 Ill. 2d 319, 337, 633 N.E.2d 654, 664 (1994). With respect to this rule, the supreme court has noted as follows:

> "[W]e [have] said, a procedure which permits the impeaching material to be presented against the defendant twice and in two forms, *viz.*, by cross-examination and by the record, is not approved. Impeachment of the defendant should be by means of the record of conviction or an authenticated copy. This rule is founded upon the possibility that a defendant might be prejudiced during a jury trial if he is forced to testify concerning prior convictions." (Internal quotation marks omitted.) *People v. Madison*, 56 Ill. 2d 476, 488, 309 N.E.2d 11, 17-18 (1974).

However, the court has also held that the presentation of a prior conviction through cross-examination does not require reversal "unless the error has deprived [the] defendant of substantial justice or influenced the determination of his guilt." *Id.*

¶ 92      In *Madison*, the court found no reversible error due to the improper presentation of prior convictions during cross-examination on the basis that there was substantial evidence presented of the defendant's guilt. *Id.* at 489. We find the same is true in the present case. The State presented strong evidence of defendant's guilt, and the record fails to reflect he sustained unfair prejudice due to the manner in which his prior convictions were admitted into evidence. Additionally, as discussed, each of the convictions brought out on cross-examination had been ruled permissible for purposes of impeachment and references to them on cross-examination

were brief and related to the mere fact that the convictions existed. See *People v. Smith*, 241 Ill. App. 3d 365, 381, 610 N.E.2d 91, 101 (1992) (holding that questioning the defendant about prior convictions on cross-examination did not constitute reversible error where there was sufficient circumstantial evidence of the defendant's guilt, the jury would have learned about the convictions in any event, and the prosecutor did not belabor the point). Thus, no reversible error occurred as defendant was not deprived of substantial justice and the State's error did not affect the outcome of the case.

¶ 93                                  3. Closing Argument and Rebuttal

¶ 94    Defendant further raises several challenges to remarks made by the prosecutor during his closing and rebuttal arguments.

¶ 95    "Prosecutors are afforded wide latitude in closing argument." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). They are "allowed to comment on the evidence and the strength of [the State's] case and to urge the fearless administration of justice and the detrimental effect of crime." *Cloutier*, 156 Ill. 2d at 507. Also, a prosecutor's closing remarks may reflect upon the credibility of a witness where the remarks are based on the evidence or inferences fairly drawn therefrom. *People v. Shum*, 117 Ill. 2d 317, 348, 512 N.E.2d 1183, 1194 (1987).

¶ 96    The wide latitude given to prosecutors is breached "when they express personal beliefs or opinions or invoke the State's Attorney's office's integrity, to vouch for a witness's credibility." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66, 44 N.E.3d 632. On review, "closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122. Again, reversal based on improper prosecutorial remarks is only necessary when there has been "substantial prejudice" to the defendant "such that the result would have been different absent the complained-of remark." *Cloutier*, 156 Ill. 2d at 507.

¶ 97    First, defendant argues the prosecutor improperly gave his own opinion on Blumenberg's credibility during his closing argument. He specifically challenges the following remark: "I really believe that *** Blumenberg was very, very truthful when he sat here." We agree that this comment constitutes an impermissible expression of a personal belief as to witness credibility. However, the improper comment was isolated, and when viewed in context, it is clear that the prosecutor also set forth an evidentiary basis for his remark. Immediately following the challenged statement, the prosecutor stated as follows:

> "[Blumenberg] talked about his addiction. He talked about his problems, He talked about the events that led up to his arrest. He talked about [defendant's] involvement in it, and, interestingly, [defendant's] involvement in it matched almost to a T what [defendant] told you he did. The only part [defendant] doesn't come clean on is the fact that he knew good and well that Coleman fuel was being brought up to make meth."

¶ 98    Here, the prosecutor ultimately relied upon inferences fairly drawn from the evidence presented when commenting on Blumenberg's credibility, and any error in his initial expression of a personal belief was minor. Accordingly, the record fails to reflect that defendant was substantially prejudiced and we find no reversible error.

¶ 99    Second, defendant asserts the prosecutor made statements during his closing and rebuttal arguments that, again, improperly encouraged an "us-versus-them" mentality. We disagree.

Viewing the prosecutor's remarks in context, we find they did not align or merge the prosecution with the jury and against defendant. Additionally, as stated, a prosecutor is permitted "to urge the fearless administration of justice and the detrimental effect of crime." *Id.* Thus, we find no error in the prosecutor's argument.

¶ 100    Although defendant has raised a multitude of challenges based on his allegation of prosecutorial misconduct, we find no merit to the majority of his claims. With respect to the errors that did occur, we find they were minor and did not affect the fairness of his trial. Also, given that strong evidence was presented of defendant's guilt, it is unlikely that a different outcome would have occurred in their absence. Ultimately, no error occurred, either by itself or cumulatively, which warrants reversal of defendant's conviction.

¶ 101                          D. Ineffective Assistance of Counsel

¶ 102    Defendant also argues that his trial counsel provided ineffective assistance. Specifically, he maintains his counsel's performance was deficient because he promised evidence in his opening statement that he did not later present, elicited evidence that was harmful to defendant, and failed to object to improper other-crimes evidence or instances of prosecutorial misconduct. Defendant asserts he was prejudiced by his counsel's errors and is entitled to a new trial.

¶ 103    To determine whether a defendant received ineffective assistance of counsel, we apply the familiar two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cherry*, 2016 IL 118728, ¶ 24, 63 N.E.3d 871. Under that test, a defendant must establish (1) that his counsel's performance "was objectively unreasonable under prevailing professional norms" and (2) "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "Because a defendant must satisfy both prongs of the *Strickland* test to prevail, the failure to establish either precludes a finding of ineffective assistance of counsel." *Id.*

¶ 104    Initially, defendant argues his counsel was ineffective for failing to fulfill promises he made during his opening statement. He notes that defense counsel indicated the jury would hear certain testimony from Burge and Connell but that he failed to present the testimony of either witness.

¶ 105    Although defense counsel's failure to fulfill promises made during an opening statement may constitute error, it does not constitute ineffectiveness *per se* and a defendant is still required to show that his counsel's error resulted in prejudice. *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 20, 41 N.E.3d 641. "The test is not whether defense counsel fulfilled every promise made during opening statements, but whether any error by counsel was so grave that had the error not occurred, the result of the case would likely have been different." *Id.*

¶ 106    In this instance, defendant cannot establish prejudice from his counsel's failure to present testimony from either Burge or Connell. First, during his opening statement, defendant's counsel asserted that Burge would testify that he had no contact with defendant around November 26, 2014, and indicated that Blumenberg might state otherwise. Defendant argues defense counsel's strategy was to show through Burge's testimony that defendant was not present at Burge's trailer on November 26, 2014, when methamphetamine was manufactured. Here, although Burge did not testify, the actual evidence presented supported defense counsel's assertions of no contact between the two men. Moreover, it was undisputed at trial

that defendant was not present at Burge's trailer on November 26, 2014, when Burge and Blumenberg manufactured methamphetamine. Accordingly, defendant was not prejudiced by the absence of Burge's cumulative testimony.

¶ 107    Second, defense counsel indicated that Connell would testify that he overheard the telephone conversation between Blumenberg and defendant on the morning of November 26, 2014, and that Blumenberg asked for Coleman fuel for his Coleman stove. Again, the evidence that defendant maintains would have been presented through the missing witness testimony was presented at trial and essentially undisputed. Specifically, Blumenberg admitted telling defendant that the fuel he was asking for was for his Coleman stove. Thus, Connell's testimony would also have been cumulative, and we find no prejudice to defendant.

¶ 108    Defendant next argues his trial counsel was ineffective for asking open-ended questions to Jacobs on cross-examination that elicited responses that improperly vouched for Blumenberg's credibility. Here, the challenged testimony from Jacobs occurred as defense counsel was cross-examining him regarding his assertion that statements from criminal suspects become more accurate over time. When viewing that line of cross-examination in its entirety and Jacob's challenged responses in context, we find neither error nor prejudice to defendant.

¶ 109    In particular, it was sound trial strategy for defense counsel to challenge testimony from Jacobs that suggested that the accuracy of Blumenberg's statements increased over time. Further, defense counsel did so effectively by suggesting that the same theory could be used to characterize defendant's statements and obtaining Jacobs' acknowledgment that Jacobs had no "way of being inside" Blumenberg's head. Additionally, although Jacobs initially testified that Blumenberg would have no reason to lie after being sentenced to prison, defense counsel's questions forced him to admit that all of Blumenberg's interviews occurred prior to Blumenberg's plea agreement. Jacobs further admitted that his belief that Blumenberg was truthful was "just a hunch that [he] had" and that Blumenberg was told he could "help himself by cooperating with the investigation." Finally, on further questioning, Jacobs reiterated that it was his "hunch" that Blumenberg had been truthful and he agreed that his belief that Blumenberg was trustworthy could be characterized as "speculation" or "instinct."

¶ 110    Finally, defendant argues his counsel was ineffective for failing to object to the majority of the "improper other-crimes evidence," request limiting instructions contemporaneously with the admission of the other-crimes evidence, and object to any instance of prosecutorial misconduct. For reasons already discussed, many of defendant's claims of error were not, in fact, error. Further, to the extent that any error occurred there was no prejudice, either from any error alone or cumulatively. The errors which did occur were minor, and the State presented strong evidence of defendant's guilt.

¶ 111                                    E. Posttrial Motion to Continue

¶ 112    Next, defendant argues the trial court erred by denying his posttrial counsel's request for a continuance to investigate whether juror Smith testified falsely during *voir dire*. "A trial court's decision to grant or deny a motion to continue is a discretionary matter, and this court will not set aside the trial court's determination unless it amounts to an abuse of discretion." *People v. Hillsman*, 329 Ill. App. 3d 1110, 1118, 769 N.E.2d 1100, 1107 (2002). After reviewing the record in this case, we find no abuse of discretion.

¶ 113    Here, during *voir dire*, the trial court asked prospective jurors whether they knew anything about the potential witnesses in the case. In response, Smith told the court that she knew "the

- 21 -

Burge boy," and that she knew "the Connells and Blumenbergs real well." She stated she would "go to [a] restaurant" with "the Burge's" and "have coffee with the grandparents." The following colloquy then occurred:

"THE COURT: Okay. All right. And is there anything about that relationship *** or your acquaintanceship with those family members that makes you feel you could not sit and make a decision in this case today?

MS. SMITH: Just by hearsay, what I heard.

THE COURT: So, maybe you heard some things about that particular matter, as well?

MS. SMITH: No, not this one.

THE COURT: Not this one, okay.

MS. SMITH: No."

Defense counsel also questioned Smith as follows:

"MR. PARISH [(DEFENSE COUNSEL)]: Okay. And *** you've heard nothing else about any other witnesses, or my client, [defendant], or anybody else for that matter that would leave you unable to make a fair and impartial ruling on all of the evidence?

MS. SMITH: Right.

MR. PARISH: Is that right?

MS. SMITH: That's right."

¶ 114 Following trial, defendant's posttrial counsel requested a continuance to investigate Smith based on "a rumor" he heard from Prokuski, an excused juror who owned a restaurant. Counsel explained that Prokuski reported that Smith "often attended coffee at [Prokuski's] restaurant with relatives of" Blumenberg and Burge, that Prokuski heard Smith and others discussing "the case" following "the bust" of Blumenberg and Burge, and that defendant's "name was mentioned on more than one occasion" in Smith's presence following his own arrest.

¶ 115 We note that "[w]here a defendant does not learn of facts which might support a finding of partiality by a juror until after a verdict, a post-trial evidentiary hearing may be necessary." *People v. Towns*, 157 Ill. 2d 90, 102, 623 N.E.2d 269, 275 (1993). "The defendant, however, *** bears the burden to introduce and offer specific, detailed[,] and nonconjectural evidence in support of his position." *Id.*

¶ 116 In this instance, we find Prokuski's asserted statements were largely consistent with Smith's representations during *voir dire* and fail to indicate that Smith falsely answered any questions. Both Prokuski's report to defendant's counsel and Smith's answers during *voir dire* indicate that Smith knew potential witnesses in defendant's case or their family members and that she had coffee with some of those family members at a restaurant. Additionally, similar to Prokuski's report that Smith and others discussed "the case" following "the bust" of Blumenberg and Burge, during *voir dire*, Smith indicated that she heard "hearsay" impacting on Burge's and Blumenberg's particular situations. Although Prokuski additionally asserted that, after defendant's arrest, his "name was mentioned on more than one occasion" in Smith's presence, Smith never denied hearing defendant's name, only "things" specific to defendant's "case." Thus, Prokuski related substantially the same information to defendant's posttrial counsel as Smith provided during *voir dire*.

¶ 117    Further, as noted by the State, "[a] juror's exposure to publicity about a case is not enough to demonstrate prejudice" and "[w]hat is essential is the juror's ability to lay aside impressions or opinions and return a verdict based upon the evidence presented in court." *People v. Coleman*, 168 Ill. 2d 509, 547, 660 N.E.2d 919, 938 (1995). Here, even if Smith was interviewed by defendant's counsel and acknowledged hearing defendant's name in the context of a discussion about Blumenberg, Burge, and facts underlying the men's criminal cases, bias or prejudice does not automatically result. This is particularly true given that Smith asserted during *voir dire* that she was able to make a fair and impartial ruling on the evidence presented at defendant's trial.

¶ 118    Finally, we disagree with defendant that it was error for the trial court to find that issues as to Smith's bias could have been followed up on at an earlier date. In reaching its decision to deny defendant's motion to continue, the court stated as follows:

> "If there was an issue in regard to her knowledge about other people who were going to testify, it could have been followed up [on] at the trial or at any time, and we're now three months from the trial date, so I will deny the motion to continue, and we will proceed today."

Certainly, Smith's answers during *voir dire* established that she knew witnesses in the case or their family members. It also indicated that she had heard something about the underlying facts relevant to Burge's and Blumenberg's criminal cases. As defendant's case ultimately involved the same underlying factual circumstances, it was not error for the court to find that the information was available to defendant at the outset of his trial.

¶ 119    In this case, the facts presented by defendant did not support a finding that a juror provided false answers during *voir dire* or that she was biased toward defendant. The cases cited by defendant are distinguishable and do not warrant a finding of an abuse of discretion by the trial court in denying the motion to continue.

¶ 120                              F. Excessive Sentence

¶ 121    Defendant argues on appeal that the sentence imposed by the trial court was excessive. He challenges both his 30-year prison sentence and the fine imposed by the court. Because we reduce defendant's conviction and remand for resentencing, we find it unnecessary to address these contentions.

¶ 122                              G. Reimbursement Fee

¶ 123    Finally, defendant argues on appeal that the $5000 fee imposed by the trial court to reimburse his court-appointed counsel should be vacated. He contends the court abused its discretion by imposing a maximum fee where he had no ability to pay and because the court appeared "not to have known that the maximum fee it could impose was [$5000]."

¶ 124    The Code of Criminal Procedure of 1963 (725 ILCS 5/113-3.1(a) (West 2012)) provides as follows:

> "Whenever *** the court appoints counsel to represent a defendant, the court may order the defendant to pay to the Clerk of the Circuit Court a reasonable sum to reimburse either the county or the State for such representation. In a hearing to determine the amount of the payment, the court shall consider the affidavit prepared by the defendant *** and any other information pertaining to the defendant's financial

- 23 -

circumstances which may be submitted by the parties. Such hearing shall be conducted on the court's own motion or on motion of the State's Attorney at any time after the appointment of counsel but no later than 90 days after the entry of a final order disposing of the case at the trial level."

A reimbursement fee should not exceed $5000 where the defendant is charged with a felony. *Id.* § 113-3.1(b). Also, the trial court may, in its discretion, order that a defendant's money bond be used "in whole or in part to comply with any payment order entered." *Id.* § 113-3.1(c). Further, "[t]he court may give special consideration to the interests of relatives or other third parties who may have posted a money bond on the behalf of the defendant to secure his release." *Id.*

¶ 125    Here, we find no abuse of discretion by the trial court. The record reflects it appropriately conducted a hearing and considered relevant factors. As the State points out, in challenging the reimbursement on appeal defendant makes allegations that are clearly refuted by the record. In particular, he contends defense counsel submitted a bill of $6741.50, and that the trial court deemed that amount "unreasonably large." In actuality, the court's comments reflect that defense counsel's bill totaled $9911. The court found that amount unreasonable and reduced it to $6471 before ordering a $5000 fee. Additionally, contrary to defendant's assertion that the court appeared not to know that $5000 was the maximum it could impose, the court expressly commented it had statutory authority to order a reimbursement "up to [$5000] for a felony."

¶ 126                                                    III. CONCLUSION

¶ 127    For the reasons stated, we reduce defendant's conviction to the offense of methamphetamine conspiracy based on his participation in the manufacture of 100 or more grams but less than 400 grams of a substance containing methamphetamine (720 ILCS 646/15(a)(2)(C) (West 2012)), remand for resentencing, and otherwise affirm the trial court's judgment.

¶ 128    Affirmed as modified; cause remanded.